## LILIENTHAL'S TOBACCO *v.* UNITED STATES.

1. The ninth section of the act of July 13, 1866 (14 Stat. 133), imposed upon "smoking-tobacco sweetened, stemmed, or butted, a tax of forty cents per pound," and "on smoking-tobacco of all kinds not sweetened, nor stemmed, nor butted, including that made of stems, or in part of stems," fifteen cents per pound. *Held,* that a mixture of smoking-tobacco, consisting of leaves from which the stems had been removed, and of stems so manipulated as to be undistinguishable from the leaf, — the proportion of stems and leaves being the same which they originally bore to each other, — was liable to a tax of forty cents per pound, as smoking-tobacco stemmed or butted.

2. Under the act of March 3, 1865 (13 id. 477), a manufacturer returned such smoking-tobacco for taxation at thirty-five cents per pound, and after the passage of the act of July 13, 1866 (*supra*), at forty cents per pound, until Aug. 20, 1866, when he somewhat increased the proportion of stems used, and for seventeen months thereafter returned it for taxation at fifteen cents per pound. *Held,* that his conduct was evidence proper to be considered by the jury, in connection with other circumstances, in determining whether or not he intended to defraud the United States of the tax to accrue upon the manufactured and the unmanufactured tobacco found in his factory at the time of seizure.

3. A. used portions of a building as a tobacco manufactory, and the remainder of it as a salesroom, having a counter at which goods were sold at retail. Cigars and tobacco removed from the factory to the salesroom, for sale at retail, were returned by him for taxation as "sold or removed for sale," though he still owned them. *Held,* 1. That this was not such a sale or removal as to entitle the tobacco to be so returned. 2. That A.'s manner of doing business was proper to be considered by the jury in determining whether or not he thereby intended to defraud the United States in respect to other tobacco in his manufactory at the time of seizure.

4. Certain tobacco, liable to a tax of twenty-five cents per pound, was, by the act of March 3, 1865 (*supra*), subjected, after the last day of that month, to a tax of thirty-five cents per pound. On March 8, 1865, A. made a fictitious sale of a large quantity of such tobacco, in order that he might return it as sold prior to April 1, 1865, and did so return it, paying but twenty-five cents per pound as the tax thereon. *Held,* 1. That he was not authorized thus to return it. 2. That the United States had the right to show the fictitious character of the transaction as tending to prove an intent to defraud, even though some of the tobacco was, when actually sold and removed, liable to pay a tax of but ten cents per pound.

5. Evidence having been given of the foregoing acts and of other violations of the internal-revenue laws by A., consisting of acts and omissions in connection with the sale and removal of tobacco subject to tax, but unconnected with the property under seizure, the court instructed the jury, in substance, that if they found that A. had in fact so violated the internal-revenue

laws, the burden of proof was upon him to satisfy them that such violations were not committed by him with intent to defraud the revenue; and that unless he did so, they might draw the inference that such intent existed; and from such inference further conclude that the property seized was also held by him with like intent, as charged in the information. *Held*, that the instruction was not erroneous.

ERROR to the Circuit Court of the United States for the Southern District of New York.

This was an information filed by the United States, March 27, 1868, in the District Court for the Southern District of New York, for the condemnation and forfeiture of a quantity of manufactured tobacco, raw materials, and other personal property seized by the collector of internal revenue for the fourth collection district, March 25, 1868, at the tobacco manufactory of Christian H. Lilienthal, in the city of New York, for a violation of sect. 48 of the act of Congress approved June 30, 1864, entitled "An Act to provide internal revenue to support the government to pay interest on the public debt, and for other purposes," as amended by the act of July 13, 1866.

Lilienthal appeared, and claimed the property.

The questions which the case involves are presented in the following charge of the court to the jury: —

The issue in this case is a very plain one. The prosecution is founded on the forty-eighth section of the act of June 30, 1864, as amended by the ninth section of the act of July 13, 1866 (14 Stat. 111); a section enacted at a comparatively early day in the history of the internal-revenue acts of this country, and which has remained on the statute-book, with some modifications, ever since, and has been enforced in a great many cases. Its provisions are these: that where any property subject to a tax under a law of the United States is found in the possession of any person, with intent to sell it, or remove it, or dispose of it, without paying the tax upon it, or without having the tax paid upon it, or with intent to defraud the internal-revenue laws of the United States, such property so found under such circumstances in the possession of any person, with such intent, shall be forfeited to the United States, and may be seized, as this property was in this case, and be proceeded against in the manner in which this property is being proceeded against in

this suit.   The same section provides that if any raw materials
are found in the possession of any person, he having the intent
in respect to them, when they are so found in his possession, of
manufacturing them into articles subject to tax, in respect to
which articles he intends that the tax shall not be paid, or that
the revenue shall be defrauded, such raw materials shall be
forfeited to the United States.   The same section goes on to
provide that, under such circumstances, not only shall the
articles subject to tax and the raw materials be forfeited, but
all personal property, of any kind whatsoever, found on the
same premises where such offending articles, so to speak, are
found, shall be forfeited.   There has been seized, in this case,
not only tobacco in a manufactured state, subject to tax, but
also a large quantity of raw materials, — raw tobacco and other
raw materials, — and a large quantity of personal property con-
nected with this establishment.   The report of the appraiser
values the entire property at $104,000.   In that amount it was
bonded and delivered to the claimant, and the government
accepted what it regarded as a satisfactory bond, in place of the
property.   It is this $104,000 worth of property, consisting
generally of tobacco subject to tax, raw materials, and other
personal property found in this establishment, that is the sub-
ject of this suit.

It is for the government to satisfy you that this property was
in this establishment with the intent mentioned, in respect to
it, on the part of those in whose custody and control it was.
For the purpose of making the matter clearly definite, I will
read the language of the statute : —

" All goods, wares, merchandise, articles, or objects on which
taxes are imposed by the provisions of law, which shall be found in
the possession or custody or within the control of any person or
persons, for the purpose of being sold or removed by such person or
persons in fraud of the internal-revenue law, or with design to avoid
payment of said taxes, may be seized by the collector or deputy
collector of the proper district, or by such other collector or deputy
collector as may be specially authorized by the commissioner of
internal revenue for that purpose, and the same shall be forfeited to
the United States ; and also all raw materials found in the posses-
sion of any person or persons intending to manufacture the same

into articles of a kind subject to tax, for the purpose of fraudulently selling such manufactured articles, or with design to avoid the payment of said tax; and also all tools, implements, instruments, and personal property whatsoever in the place or building, or within any yard or enclosure, where such articles or such raw materials shall be found, may also be seized by any collector or deputy collector, and the same shall be forfeited as aforesaid."

The district attorney has stated to you, in his summing up, the various grounds upon which he claims the forfeiture of the property seized; that is, the various grounds upon which he maintains that he has proved the existence of this intent, in respect to the taxable tobacco and the raw materials and other property seized in the factory of Lilienthal. As you have seen, the testimony is entirely testimony in regard to what are alleged to have been previous acts of omission and of commission on the part of Lilienthal and persons in his establishment, in respect to the conduct of their business at previous times in relation to the internal-revenue laws of the United States. This is a class of evidence which, as has been expressly adjudicated in many cases by the Supreme Court of the United States, is perfectly competent and legitimate evidence from which to infer a fraudulent intent in respect to existing property. It has been held, in respect to the importation of goods at the custom-house, that a fraudulent intent in respect to a particular importation of goods may be legitimately inferred by a jury from a previous fraudulent intent and previous fraudulent acts, shown in respect to property previously imported through the custom-house. There is a large class of cases on that subject, and the doctrine has been recently applied to an action under the internal-revenue laws by the circuit judge of this circuit, in a case in the northern district of New York in regard to distilled spirits. It is, therefore, a class of evidence that can be legitimately appealed to, and is appealed to, in all cases of this kind. Sometimes it is accompanied by other evidence, in respect to an existing intent, in regard to property seized. Sometimes property seized is found concealed; and to support the idea that fraud was intended in regard to it, previous fraudulent acts are given in evidence. Sometimes, as in this case, the evidence consists almost entirely of testimony in regard to previous acts,

and to what is claimed by the district attorney to have been the fraudulent intent existing in such previous acts.

I shall call your attention particularly to the various matters that are relied on by the district attorney. The first one is in regard to what is called "extra long smoking-tobacco," a species of tobacco in regard to which it may be generally stated that it has in it a very large proportion of stems. It is a kind of tobacco which, according to the evidence, was manufactured in this establishment, as a part of its ordinary business, prior to the 1st of August, 1866, at which date commenced this series of returns, seventeen in number, which are the main subjects of consideration in this case. It is a species of tobacco that was manufactured previous to that time, and returned month by month in the monthly returns. That date is taken in this case because it is the date when the act of July 13, 1866, changing the rate of duty on various descriptions of tobacco, went into operation. Previous to that time the act imposing a tax on tobacco was the act of March 3, 1865, 13 Stat. 469. That act of March 3, 1865, divided smoking-tobacco into two classes for taxation. One class, made exclusively of stems, was taxed fifteen cents a pound; and smoking-tobacco of all kinds, not included and provided for under the fifteen cents clause, was taxed thirty-five cents a pound. It appears from the evidence that the "extra long smoking-tobacco," so made in this establishment prior to Aug. 1, 1866, and so being made in it when the act of July 13, 1866, was passed, had been, up to the 1st of August, 1866, returned by Lilienthal as "smoking-tobacco," under this thirty-five cents clause, and not under the fifteen cents clause. Not being made exclusively of stems, it was not liable to the fifteen cents tax, and therefore it was liable to the thirty-five cents tax. It also appears that, for some twenty days or so after the 1st of August, 1866, when this new law, July, 1866, went into effect, this "extra long smoking-tobacco," which had before Aug. 1, 1866, been returned at thirty-five cents, was returned by Lilienthal as liable to a tax of forty cents, under a clause in the act which so went into effect Aug. 1, 1866, and was returned by him under the head of "chewing-tobacco." The reason stated by the claimant for returning such tobacco as "chewing-tobacco" is, that there

was no place to insert it in the form of return, except under the head of "chewing-tobacco." It had, however, been previously returned as "smoking-tobacco," and it was called "smoking-tobacco" in the price-list issued by the claimant. After it had been returned for some twenty days after the 1st of August, 1866, as liable to a tax of forty cents a pound, it was at all times thereafter returned by the claimant as liable to a tax of fifteen cents a pound; it was continued at that rate throughout all the returns, down to the 31st of December, 1867, and all the smoking-tobacco of every kind that was returned by the claimant in all the returns made by him during all the seventeen months was returned at fifteen cents a pound, and no smoking-tobacco was returned at forty cents a pound. There was no class of thirty-five cents smoking-tobacco in the act of July, 1866. The only classes of smoking-tobacco in that act were these two, — smoking-tobacco sweetened, stemmed, or butted, forty cents per pound; and all smoking-tobacco not sweetened, nor stemmed, nor butted, including that made of stems or in part of stems, and imitations thereof, fifteen cents per pound. A great deal was said in this case on the argument to the court as to the proper construction of the act of July, 1866, in regard to the tax on this "extra long smoking-tobacco." You will recollect that, during the greater part of the seventeen months after the 1st of August, 1866, all except a very small portion of the time, at the commencement, this "extra long smoking-tobacco" was prepared by putting into it rather more stems, say ten pounds more in every ninety pounds of product, than they had been in the habit of putting in before the 1st of August, 1866. It always had had a large proportion — not a preponderance — of stems in it, although it was not made exclusively of stems. I do not consider it necessary in this case to determine what is the proper interpretation of this fifteen cents clause in the act of July, 1866, or under what head in that act, as a matter of law, this "extra long smoking-tobacco," manufactured in the manner described by Dennerker, properly falls. The facts, to recapitulate them, about which there is no dispute, in regard to this "extra long smoking-tobacco" are, that at the time this act of July 13, 1866, went into effect, Lilienthal was manufacturing this "extra long

smoking-tobacco;" that, previous to that time, he had returned it at thirty-five cents a pound, as "smoking-tobacco," under the act of March 3, 1865; that after the act of July, 1866, went into effect, and until about the 20th or 21st of August, 1866, he returned it at forty cents a pound; and that after that time the mass, if not all of it, during the entire residue of the seventeen months, was returned at fifteen cents a pound, — there being no difference whatever in the tobacco during all the periods when it was so returned at the several rates of thirty-five, forty, and fifteen cents, except that during almost all of the seventeen months, commencing with August, 1866, it contained in every ninety or one hundred pounds ten pounds more of stems than it had before August, 1866, been in the habit of containing. The quantity of it in the returns for such seventeen months was quite large. The district attorney claims that the average was about five thousand pounds a month; and, at all events, the quantity was considerable.

The district attorney has addressed to you an argument for the purpose of showing that, no matter what the interpretation of the act of July, 1866, may properly be, the conduct of Lilienthal in regard to this "extra long smoking-tobacco" shows an intent on his part throughout to defraud the government in regard to the tax upon such tobacco. It is for you to say whether you believe that he has established the proposition for which he contends. The theory on the part of the defence is, that because this tobacco had some stems in it, it was liable to a tax of fifteen cents a pound; that, at all events, Lilienthal, reading the law for himself, had a right to think that it was capable of a double interpretation, and that there could be no fraudulent design or intent on his part until his attention was in some way called to the subject, or until the matter had been judicially determined. The district attorney on his part contends that if to put any stems whatever into the tobacco reduces it to a fifteen-cent tax, it makes no difference how much stems there are in it, more or less; and that therefore the testimony in regard to putting more stems into this tobacco has no bearing upon any honest transactions in regard to this matter. In other words, he claims that if the ground taken by Lilienthal at the time, that this tobacco was liable to the fifteen

cents tax because it had some stems in it, was correct, and that all tobacco, under the act of July, 1866, which had any stems in it, or was made in part of stems, was liable to fifteen cents a pound tax and not forty cents, then it was absurd to put in any more stems, because the quantity of stems that was in already was entirely sufficient to bring the tobacco within the fifteen cents tax. It is for you to say what force and weight you will give to this argument. In that connection the district attorney calls attention to the fact that, all through the seventeen months, all the smoking-tobacco that was returned by Lilienthal was returned at the fifteen cents rate, and none was returned at forty cents a pound. He also claims that the books of Lilienthal show that Lilienthal had a purpose to benefit himself, and not to deal honestly with the government, in this: that what was returned by him at forty cents a pound, during the short time he returned it at that rate, after the act of July, 1866, went into operation, appears by the books to have been sold at seventy cents a pound; and when he returned the tobacco at fifteen cents a pound, thus reducing the tax by twenty-five cents a pound, he reduced his price to the purchaser by only ten cents a pound for the same tobacco, with the same increased quantity of stems in it, — thus making to himself a clear difference in his own favor, as is claimed, of fifteen cents a pound out of the twenty-five cents a pound reduction in the tax. That is claimed by the district attorney to be a circumstance to be taken into consideration. It is also claimed by the district attorney that there is no evidence to show that the government had any information until February, 1867, as to how this "extra long smoking-tobacco" was made; that at that time, when such information was communicated to Van Wyck, the collector, as is shown by his letter of March, 1867, to the Internal-Revenue Office, he supposed the state of facts to exist which is disclosed in that letter, namely, that the identical stems which were taken out of the tobacco for the purpose of being subjected to this treatment, which would assimilate them to leaf-tobacco in appearance, and perhaps in flavor, were put back with the leaves from which they were taken; that the internal-revenue office, when, in August, 1867, it replied to the letter of Van Wyck, acted upon that idea, and in this way:

that while the act of July 13, 1866, said that smoking-tobacco stemmed should pay a tax of forty cents a pound, the commissioner of internal revenue stretched a point in favor of the tobacco manufacturers by saying to them : " Although you take away physically the stems from the leaves in the course of your manufacture, so that in one sense the tobacco is stemmed, nevertheless, for the purpose of giving you the privilege of putting those stems through this manipulation, we will consider. that the tobacco is not stemmed, provided you put back those identical stems with the leaves to which they belong." The district attorney also contends that, inasmuch as the claimant returned this tobacco, under the act of 1865, at the rate of thirty-five cents, and then returned it for a little while, under the act of 1866, at forty cents, and then changed the rate to fifteen cents, he has not shown honesty and good faith, because it does not appear that he laid all the facts before the Internal-Revenue Department, and asked what the tax on the tobacco should be, but put it down, month after month, at fifteen cents a pound, without raising the question whether the rate ought not, perhaps, to be forty cents. These I understand to be substantially the views urged on the part of the government in regard to that question. You will perceive that those views are, as I said before, entirely irrespective of any determination, as a matter of law, as to what in fact the tax on that tobacco was ; and it is for you to say what inference you will draw from all this testimony in regard to the intent Lilienthal had in respect to this " extra long smoking-tobacco." The question applies to the entire series of months from August, 1866, to December, 1867. The seizure took place in March, 1868 ; and it appears from the inventory of the property seized that there was among it a considerable quantity of " extra long smoking-tobacco," some of it loose and some of it in papers. These are all the remarks which it seems necessary to make to you in regard to this " extra long smoking-tobacco."

The next subject is the Orinoco tobacco, which was sent to California in April and May, 1867, — on the 13th of April, thirty-six hundred pounds, and on the 29th of May, thirty-four hundred pounds. It is admitted that this tobacco was not returned for tax at that time, — April and May, 1867. There

is no dispute that it was sent out of the establishment at that time; that it was removed for sale at that time; that it was sent to California to be sold at that time; and that it was not put into any return at that time. If it had been put into a return at that time, there is no dispute that it would have come under the fifteen cents tax under the act of 1866, because it was tobacco which had not been in any manner stemmed. It was leaf and stem together, just as it grew, pressed into a mass, into a cake. Not having been stemmed, it was not subject to a duty of forty cents a pound, and it fell directly under the fifteen cents clause, as smoking-tobacco not stemmed. The history of that tobacco, as developed, is this: It was returned for tax as a portion of a larger mass of the same description of tobacco, Orinoco tobacco, on the 31st of March, 1865, the day before the 1st of April, 1865, and the day before the act of March 3, 1865, went into effect. That act of March 3, 1865, imposed a higher tax upon that description of tobacco than it had been previously subject to under the act of June 30, 1864. Under the act of June 30, 1864, that tobacco was liable for a tax of twenty-five cents a pound. The provision of that act was: " Smoking-tobacco, manufactured with all the stem in, the leaf not having been butted or stripped from the stem, twenty-five cents per pound." Under the act of March 3, 1865, which was to go into effect on the 1st of April, 1865, this tobacco, which, up to the close of the 31st March, 1865, was liable to a tax of twenty-five cents a pound, would have been liable to a tax of thirty-five cents a pound, being an increase of ten cents a pound. Lilienthal at that time went through the process that was developed on the trial, and stated by himself in his testimony, of entering upon his sales-book a sale, or a transaction as a sale, of the mass of Orinoco tobacco, of which this seven thousand pounds, which were afterwards sent to California in April and May, 1867, formed a part, and of a large quantity of other tobacco, in all some $60,000 worth, to a house in this city, Kearney & Waterman. Kearney & Waterman gave him their check for that amount, and, two or three days afterwards, he gave to Kearney & Waterman his check for the same amount. The tobacco was not removed from his establishment, and never passed into the possession of Kearney & Waterman. Lilienthal

kept it on his own premises, and, after he brought it back (as the expression is) he treated it as his own, and disposed of it as such. In connection with such alleged sale in that way to Kearney & Waterman, on the 31st of March, 1865, Lilienthal put that Orinoco tobacco into the tax, at that date, at the rate of twenty-five cents a pound, and returned it as sold. He told you frankly on the stand that he went through this operation because, under the law of 1865, there was going to be a higher duty on such tobacco. He kept the tobacco on hand so long that there came another change in the law, and by the time he sent it to California, if he had not paid any tax on it before, he would have had to pay on it a tax of only fifteen cents a pound. It is my duty to say to you that that transaction was utterly illegal. The ninety-fourth section of the act of June 30, 1864, under which Lilienthal was acting at the time he returned this tobacco for tax on the 31st of March, 1865, before the act of March 3, 1865, went into effect, provided as follows: "Upon the articles, goods, wares, and merchandise hereinafter mentioned, except where otherwise provided," which includes this tobacco taxable at twenty-five cents a pound, "which shall be produced and sold, or be manufactured or made and sold, or be consumed or used by the manufacturer or producer thereof, or removed for consumption or for delivery to others than agents of the manufacturer or producer, within the United States or territories thereof, there shall be levied, collected, and paid the following duties, to be paid by the producer or manufacturer thereof." It is perfectly clear that that transaction was no real sale of the property. It was not intended to be a sale. It was, as it has been well characterized here, a perfect sham, from beginning to end. Now, it was illegal to return the Orinoco tobacco for tax, because it was not sold, nor was it removed for consumption. The words "removed for consumption," in the act of 1864, are defined by the provisions of the ninety-first section of the same act. The property must be removed from the premises of the manufacturer in good faith, with a then present intention to have it consumed, as against the will of the manufacturer and owner of it, giving a right to another person to put it into consumption, or the property in it must in some way be changed, or it must be sent for sale on commission, or,

in some way or other, an intention to put it into the category prescribed by the act must be manifested in regard to it. But this property, you will remember, remained on the premises of Lilienthal, not disturbed in any manner, and was returned for tax under the circumstances stated.

It is claimed on the part of the defence, that, inasmuch as the tax of twenty-five cents a pound had once been paid upon this Orinoco tobacco, there was no obligation on the part of Lilienthal to make a subsequent return of it, and to pay another tax on it; and that this was the case, *a fortiori*, if, as was the fact at the time the tobacco was sent to California, the tax on it would have been fifteen cents a pound. In this connection reference was made to the following provision in the seventh section of the act of July 13, 1866, which went into effect on the 1st of August, 1866, and was in force when this Orinoco tobacco was sent to California, in April and May, 1867: "All manufactures and productions on which a duty was imposed by either of the acts repealed by this act," which embraces the provisions imposing duties on tobacco contained in the previous act of June, 1864, which was the act in force when this tobacco was returned for tax on the 31st of March, 1865, "which shall be in the possession of the manufacturer or producer, or of his agent or agents, on the day this act takes effect, the duty imposed by any such former act not having been paid, shall be held and deemed to have been manufactured or produced after such date." The defence contends that the duty on this tobacco had been paid, within this provision. But that is not the law. The law says, all manufactures "on which a duty was imposed," "the duty imposed" by the act of 1864 not having been paid. Now, no duty was imposed upon this Orinoco tobacco. A duty was imposed upon it only when it was sold in good faith or removed for consumption. There was no duty imposed upon it at the time it was returned for tax at twenty-five cents a pound. The claimant had no right to return it at twenty-five cents, particularly when it is acknowledged by himself, on the stand, that he did so for the purpose of getting rid of the coming thirty-five cents duty, and when, therefore, it is clear that there was an intent to commit a fraud on the government. The act of 1866 only applies to the payment of a duty which has been imposed.

Otherwise a party would be able to take advantage of his own wrong, by paying a tax of twenty-five cents a pound for the purpose of getting rid of a tax of thirty-five cents that was going into effect the next day, and paying the tax when the law gave him no right to pay it, and afterwards to say that, because he had paid it, there was no intent to defraud the government, and that thus the fraud so committed was condoned.  The law is not so. The law merely says that if a tax which has been imposed has been paid, no tax can be collected again on the same article. You are to consider the question not solely in the light of the fact that the law happened to be altered again, and the duty to be reduced from thirty-five cents to fifteen cents a pound, before the tobacco was sent to California, but also in the light of what Lilienthal did, and what his intent was, in regard to the tobacco, as bearing upon his intent in regard to the tobacco found in his possession when his establishment was seized.

The district attorney has called your attention, very properly, to the fact that the law, in all its provisions, aims at this: that manufacturers of tobacco shall not be allowed to aggregate in their establishments large quantities of tax-paid goods.  An account is to be kept of goods sold, as they are sold and removed.  They are to be removed from the premises, — removed for consumption.  They are not to be returned in masses, at the pleasure of the manufacturer, at a given time, without being disturbed in any manner or removed from his establishment, so that he may be enabled to have on hand a large mass of goods, from which he can say, at any time, that any particular goods sold which cannot be traced were taken.  These considerations, addressed to you, are considerations of force, and are to be taken into view by you in judging of the intent with which a manufacturer aggregates upon his premises, without removing therefrom, a large quantity of tax-paid goods, such a practice being against all the provisions of the law, and directly unlawful in respect to this Orinoco tobacco, so returned for tax on the 31st of March, 1865.

The next subject in regard to which the district attorney claims that a fraudulent intent is shown on the part of Lilienthal is in respect to the account which, by the ninetieth section of the act of 1864, as amended by the ninth section of the act

of 1866, is required to be kept by every tobacco manufacturer. We have had exhibited here all the books on the subject kept in this establishment. They appear not to be blank forms printed, but to be entirely in writing. This one is headed, "Account of tobacco and snuff sold by C. H. Lilienthal in the year 1867." The heading is all in writing. This one that preceded it appears to have a heading in print. But in regard to both of them, it may be said that they embrace nothing but goods sold. They in no manner embrace, or pretend to embrace, goods manufactured. The earlier book is headed, "Quantity of tobacco and snuff sold and consumed, and removed for sale or consumption, from the factory;" and the latter book is headed, "Account of tobacco and snuff sold." In regard to this matter the law is explicit. It requires every manufacturer of tobacco, snuff, or cigars to "keep in book form an accurate account of all the articles aforesaid thereafter purchased by him, the quantity of tobacco, snuff, snuff-flour, or cigars, of whatever description, manufactured, sold, consumed, or removed for consumption or sale, or removed from the place of manufacture." It is perfectly clear that, in this case, no such book was kept by Lilienthal, and no book showing in any manner the manufactured goods, but showing only those that were sold. "Manufactured" goods means goods the manufacture of which is completed, so that the goods are in a condition to be sold, and so that all that needs to be done, if a purchaser asks for them, is to deliver them. No account of such goods was kept. When the manufacturer comes to make up his abstract, and hand it in to the assessor, he is not required to hand in an abstract of goods manufactured. He is required to hand in only an abstract of goods purchased, sold, or removed. But Lilienthal, as you perceive, had, in the abstracts returned by him, a column for goods manufactured, as well as one for goods sold and removed for sale. He had no book, however, from which he could obtain any entries to put into the column of goods manufactured, because no such book was kept; and therefore that happened which you naturally expect would happen. He filled up the column of goods sold, in the abstract furnished to the government, from the book kept by him, of goods sold; and when he came to fill up the column of goods manufactured, having no

record of them, he put down in every case, as manufactured, the same quantity which he put down as sold.

It was a clear violation of law not to keep an account of goods manufactured. The reason why the law requires this book of goods manufactured to be kept, although it does not require the abstract returned by the tenth day of each month to set forth the goods manufactured, is, that the manufacturer is required to furnish a statement or inventory every January, setting forth all the property he has on hand in his business, and what portion of the goods was manufactured or produced by him, and what portion was purchased from others. Therefore, unless a record be kept of goods manufactured, it is impossible for the manufacturer to comply with the law, by handing in every January a true statement of all the goods on hand, specifying which of them were manufactured or produced by him, and which of them were purchased.

The district attorney has also called your attention to the inventories furnished by Lilienthal for 1867 and 1868, and to what he claims are discrepancies between them and the monthly returns made to the government. It is for you to say what inference you will draw therefrom with regard to any intent on the part of Lilienthal. The twelve returns for 1867, in respect to chewing-tobacco, correspond throughout, in the columns for manufacture and sale, so many pounds being manufactured, and the same number of pounds being sold, in the same month. As a matter of course, the quantity of manufactured chewing-tobacco set forth as on hand in the inventory of 1868 ought not to have been greater or less than the quantity of manufactured chewing-tobacco set forth as on hand in the inventory of 1867; and yet the district attorney states that the two inventories differ in that respect. So, in regard to fine-cut shorts, the two columns for manufacture and sale are alike in the twelve returns for the year 1867, and yet the two inventories do not correspond in respect to fine-cut shorts. So in regard to smoking-tobacco, the district attorney claims there is a like discrepancy. He also claims that the Orinoco tobacco, if it were sold and brought back, ought to have been returned as purchased goods on hand on the 1st of January, 1867, whereas he claims it was not so returned. All these circumstances are commented

upon by the district attorney, for the purpose of inferring from them an intent on the part of Lilienthal throughout, in the manner in which he kept his books, and in the manner in which he returned for tax, under the act of 1865, the tobacco which he had on hand when that act went into effect, and in the fact that he kept on hand a large quantity of tax-paid tobacco, contrary to the policy of the law, not to deal honestly with the government, but to violate the law, and thence of inferring a fraudulent intent in regard to the goods on hand in his establishment when it was seized.

The last subject to which attention was called by the district attorney was the result of the examination of the books of the claimant. It appears from them, in respect particularly to that which occupied so much time in the investigation, — the Orinoco tobacco and the killickinick tobacco, — that there are large quantities of granulated tobacco found in the order-books that are not found, in the same specific items, in the tax-books, and large quantities of granulated tobacco returned for tax in the tax-books which cannot be identified with any specific items in the order-books. A great many items were identified, and, in regard to those which could not be, you will recollect the testimony of Dennerker. When asked, " Where did the granulated tobacco come from which filled the orders in the order-books, which cannot be identified as items in the tax-books ? " it was part, he said, of a large mass that had been entered for tax on a certain day, and taken downstairs into the retail-counter department. Under the law, that was a wholly illegal mode of doing business. Lilienthal had no right arbitrarily to take a quantity of killickinick tobacco and return it for tax, and remove it downstairs into his retail-counter department, or into any other part of his premises, and peddle it out by the pound from day to day for an indefinite period of time. When it was so entered for tax, as I stated before in regard to the Orinoco tobacco, it had not been sold, and it was not removed for consumption, within the law. Removing it from upstairs to downstairs was not a removal for consumption, within the meaning of the statute. In addition to that, it is admitted that, when tobacco so taken in masses, and returned for tax, and then taken downstairs to the retail counter, was

sold at the retail counter afterwards, no record of those sales was kept, in any manner whatever. The ninetieth section of the act of 1864, as amended by the act of 1866, requires that a record shall be kept of all sales, and that an abstract of such sales shall be returned by the tenth day of each month. This property, when it was taken from upstairs to the retail-counter room, was not sold by Lilienthal to anybody. It was not sold to himself. It was not removed from his premises for consumption. It was taken from upstairs and brought downstairs, and, when it was sold over the counter, no record of it was kept, in utter violation of the statute, and no abstract of it was returned, in violation of the statute. Lilienthal arbitrarily took three hundred or four hundred pounds and returned it for tax to-day, and then carried it downstairs, and then kept no record whatever of its subsequent sale. So that the purpose of the law was defeated by this transaction, because the government could have no means, when it got hold of Lilienthal's books, of tracing the sales of the tobacco. The fact that the government has been foiled in tracing such sales has been demonstrated here, because, no record of the sales having been kept, whenever any order which was found in the order-book could not be identified with an item in the tax-book, specifically returned as so many pounds, Dennerker testified that the order was filled out of the masses of tobacco which so went downstairs to the retail counter. The business, therefore, was conducted in such a manner as to deprive the government of what the law designed to provide, namely, a check over the transactions of tobacco manufacturers.

I have thus gone over the books of the claimant. It was necessary that I should show you what are violations of the law, in order that, if you should come to the conclusion, from the evidence, that such violations of law, in point of fact, took place, and that they showed an intent on the part of Lilienthal to defraud the revenue, you might have before you the law and the facts from which the district attorney claims that you have a right to infer a fraudulent intent on the part of Lilienthal, in respect to the tobacco on hand at the time of the seizure. I do not design to intimate any opinion whatever in regard to any intent on the part of Lilienthal in respect to

these matters.    But the facts in this case are undisputed. There is no serious contest about a single fact, except in regard to the very point of the law, — the intent.    On the part of the claimant, it is claimed that the investigation before you has shown that, in point of fact, the government has not proved that it has been deprived of any tax; and also that it has been shown affirmatively, by an examination of the books, that the government has received all the taxes to which it was entitled, upon all goods which passed out of the establishment of Lilienthal prior to the seizure.    You have heard all the evidence and the summing up on that subject, and it will be for you to say what is your belief on that subject, as bearing on the question of Lilienthal's intent in respect to the goods seized.

The instructions of law prayed by the claimant are twelve in number, to all of which I assent.    The thirteenth and fourteenth instructions, which are requests to charge as to the facts, I decline to charge, as not being questions of law.

The propositions on the part of the government are substantially what I have already stated, but I will go over them, for the purpose of saying that I assent to them.

" First.    If the jury find that the books, Exhibits Nos. 138 and 138A, were kept by Lilienthal or his agents, as and for the account in book-form required to be kept by the provisions of the ninetieth section of the act of June 30, 1864, as amended by the ninth section of the act of July 13, 1866, and that the said Lilienthal and his agents have therein kept no account of the quantity of tobacco or snuff manufactured by said Lilienthal at his factory in Washington Street, from Aug. 1, 1866, to Jan. 1, 1868; that quantities of tobacco and snuff were removed for sale and removed from the said place of manufacture during said period, and that no account of the tobacco and snuff so removed was kept as of removals thereof, and no accurate account of the tobacco and snuff so removed was kept in any manner in said books " (that refers to the sales over the retail counter, of which no record was kept, as sales); " that large quantities of granulated tobacco and other descriptions of tobacco manufactured were sold by Lilienthal during said period, and that no account of such sales, as sales, was kept in those books; that quantities of purchased manu-

factured tobacco were sold and removed from the said premises during the period from Aug. 1, 1866, to Dec. 1, 1867, and that no accurate account of such sales or removals was kept in said books ; that Exhibits numbered 1 to 17, both inclusive, were furnished to the assistant-assessor of the district by the said Lilienthal or his agents as true and accurate abstracts of all such sales and removals, and were not true and accurate abstracts thereof " (that means, not that they were not true and accurate abstracts of the books which Lilienthal kept, not that Dennerker did not transfer them accurately from his tax-book into the return, but that they were not, as recorded by Davis, true and accurate abstracts of the actual transactions) ; " that the annual inventories, Exhibits 18 and 19, were made out and delivered by said Lilienthal to the assistant-assessor of the district, severally, as true statements and inventories of the matters and things therein contained, as required by the said ninetieth section, as amended as aforesaid ; that it appears from said inventory and abstracts that much more chewing-tobacco and fine shorts was manufactured in said manufactory during the year 1867 than was declared upon said abstracts to have been manufactured ; that a large quantity of smoking-tobacco manufactured on said premises has been sold or removed during the year 1867, which had not been returned for taxation upon the said abstracts, and of which no account was contained therein or in said books, Exhibits Nos. 138 and 138A, — then the burden of proof is upon the claimant to satisfy the jury that the tobacco so manufactured on. said premises, and sold or removed without due account, return, and entry made thereof in the said books and abstracts, in the manner required by law, was not so sold and removed in fraud of the internal-revenue laws, and with the intent to evade the taxes thereon ; and if the claimant shall not have so satisfied the jury of his intent respecting the same, the jury may infer that the claimant's intent in respect to the same was fraudulent, and that his possession of the goods in suit was with the like intent."

I also charge the second proposition: " If the jury find that prior to Aug. 1, 1866, when the act of July 13, 1866, went into effect, changing in some respects the rates of taxation on manu-

factured smoking-tobacco, a brand of smoking-tobacco known as 'extra long smoking-tobacco' had been manufactured by Lilienthal, by cutting together stripped or stemmed leaf and stems in certain proportions, and had been sold and returned for taxation by him as 'smoking-tobacco,' subject to a tax of thirty-five cents per pound under the existing law; that from the time said act of July 13, 1866, went into effect, the said 'extra long smoking-tobacco,' manufactured as aforesaid, was entered by said Lilienthal in the account required to be kept in book-form by the ninetieth section of the act of June 30, 1864, as amended by the ninth section of the act of July 13, 1866, of sales and removals of manufactured tobacco, as 'chewing-tobacco,' and was returned upon the abstracts of said accounts required to be furnished monthly to the assistant-assessor of the district, by said section, as 'chewing-tobacco,' subject to a tax of forty cents per pound, under the provisions of said act of July 13, 1866; that after the said first day of August, 1866, said Lilienthal varied the process of manufacturing said 'extra long smoking-tobacco' by merely increasing the proportion of stem; and from the twenty-first day of August, 1866, in each monthly return during the years 1866 and 1867, returned for taxation sales and removals of large quantities of the 'extra long smoking-tobacco,' so manufactured as 'smoking-tobacco,' subject to a tax of fifteen cents per pound under the provisions of said act of July 13, 1866; that the said 'extra long smoking-tobacco,' returned as 'chewing-tobacco' for taxation at the rate of forty cents per pound, was sold at seventy cents per pound, and the said 'extra-long smoking-tobacco' returned as 'smoking-tobacco' for taxation at the rate of fifteen cents per pound, was sold at the rate of sixty cents per pound; that no officer of internal revenue was advised by Lilienthal or his agents of the said practice of returning the said 'extra long smoking-tobacco' for taxation at fifteen cents per pound; that the commissioner of internal revenue had published his instructions and opinion that tobacco so manufactured was subject, under the said act of 1866, to the tax of forty cents per pound, as 'smoking-tobacco,' and never directly or indirectly countenanced or sanctioned the practice of Lilienthal in returning the said 'extra long smoking-tobacco;' and if the jury believe from

these facts that said Lilienthal and his agents made the said change in the process of manufacturing the said 'extra long smoking-tobacco,' and the said change in the manner of returning the same for taxation, during the said period from Aug. 1, 1866, to Jan. 1, 1868, for the purpose of selling and removing the same in fraud of internal-revenue laws, and with intent to evade the payment of taxes thereon, — then they would have a right to infer that the claimant and his agents had the like intent with respect to the property in suit."

I believe these are all the considerations which it is necessary to present to you in regard to this matter. You have listened patiently to the evidence, and to the summing up of the counsel, which has been exceedingly clear and thorough on both sides, and it is for you to say, on your oaths, what you believe to have been the intent of Lilienthal in respect to this property so seized. If the government has not made out, to your satisfaction, that such intent to commit a fraud upon the law or to evade the payment of taxes, in respect either to the goods on hand or to the goods to be manufactured out of the raw materials on hand, existed on the part of Lilienthal at the time the goods were seized, your verdict will be for the claimant.

The instructions prayed for by Lilienthal, and refused, as well as his exceptions to the charge as given, will appear in his assignment of errors in this court.

There was a verdict " for the United States, condemning the goods," and a judgment rendered, condemning them " as forfeited to the United States." The judgment was, on error, affirmed by the Circuit Court; and Lilienthal thereupon sued out this writ, and here assigns for error that the court below erred —

1. In refusing to grant the claimant's thirteenth prayer, " That there is no evidence in this action that, at the time of the finding or seizure of the property in this action, the claimant had not paid all the taxes due on all the goods, wares, merchandise, articles, or objects which had been before that date manufactured at his factory, and sold or removed therefrom."

2. In refusing to grant the claimant's fourteenth prayer, " That there is no evidence in this action that any goods,

wares, merchandise, articles, or objects on which taxes were imposed by the provisions of law, manufactured at the factory of Lilienthal, were ever sold or removed by him, or by any other person, in fraud of the internal-revenue laws, or with design to avoid payment of said taxes."

3. In refusing the claimant's following prayer: "If the jury find that, in the process of manufacturing the 'extra long smoking-tobacco,' a portion of the stem was removed from the leaf, and an amount of stem fully equal to or exceeding the quantity removed was subsequently, during said process, added to and intermingled with the leaf, so that, in point of fact, the manufactured product was composed of both stem and leaf, and so sold, that tobacco was, between August, 1866, and the date of seizure, liable to a tax of only fifteen cents per pound, and was properly returned at that rate."

4. In refusing the claimant's further prayer, "That the 'extra long smoking-tobacco,' if manufactured in the manner testified to by Dennerker, was smoking-tobacco made in part of stems, and was liable, under the act of July 13, 1866, to a tax of fifteen cents per pound during all the time subsequent to Aug. 1, 1866, and prior to the date of seizure of the property proceeded against in this action."

5. In refusing the claimant's further prayer, "That if the 'extra long smoking-tobacco' returned as liable to the fifteen cents rate was manufactured in the manner stated in the testimony of Dennerker, and contained a quantity of stem as great as, or greater than, that which grew with the leaf contained in said tobacco, then the said tobacco was liable, between Aug. 1, 1866, and the time of the seizure of the property herein proceeded against, to the fifteen cents tax, as returned."

6. In granting the first prayer asked on behalf of the government.

7. In granting the second prayer asked on behalf of the government.

8. In charging the jury that "Under the act of March 3, 1865, which was to go into effect on the 1st of April, 1865, this tobacco (that known as the Orinoco tobacco), which, up to the close of the 31st of March, 1865, was liable to a tax of twenty-

five cents a pound, would have been liable to a tax of thirty-five cents a pound."

9. In charging the jury as follows: "It is my duty to say to you that that transaction (the affair of the Orinoco tobacco) was utterly illegal."

10. In charging the jury that "It was illegal to return the Orinoco tobacco for tax, because it was not sold, nor was it removed for consumption."

11. In charging the jury that "It is claimed on the part of the defence, that, inasmuch as the tax of twenty-five cents a pound had once been paid upon this Orinoco tobacco, there was no obligation on the part of Lilienthal to make a subsequent return of it, and to pay another tax on it; and that this was the case, *a fortiori*, if, as was the fact at the time the tobacco was sent to California, the tax on it would have been fifteen cents a pound. In this connection reference was made to the following provision in the seventieth section of the act of July 13, 1866, which went into effect on the 1st of August, 1866, and was in force when this Orinoco tobacco was sent to California, in April and May, 1867: 'All manufactures and productions on which a duty was imposed by either of the acts repealed by this act,'— which embraces the provisions imposing duties on tobacco contained in the previous act of June, 1864, which was the act in force when this tobacco was returned for tax on the 31st of March, 1865,— 'which shall be in the possession of the manufacturer or producer, or of his agent or agents, on the day this act takes effect, the duty imposed by any such former act not having been paid, shall be held and deemed to have been manufactured or produced after such date.' The defence contends that the duty on this tobacco had been paid, within this provision. But that is not the law. The law says, all manufactures 'on which a duty was imposed ' ' the duty imposed' by the act of 1864 not having been paid. Now, no duty was imposed on this Orinoco tobacco. A duty was imposed upon it only when it was sold in good faith, or removed for consumption. There was no duty imposed upon it at the time it was returned for tax at twenty-five cents a pound. The claimant had no right to return it at twenty-five cents, particularly when it is acknowledged by himself on the stand that he

did so for the purpose of getting rid of the coming thirty five cents duty, and when, therefore, it is clear that there was an intent to commit a fraud on the government.   The act of 1866 only applies to the payment of a duty which has been imposed. Otherwise, a party would be able to take advantage of his own wrong, by paying a tax of twenty-five cents a pound for the purpose of getting rid of a tax of thirty-five cents that was going into effect next day, and paying the tax when the law gave him no right to pay it, and afterwards to say that, because he had paid it, there was no intent to defraud the government, and that thus the fraud so committed was condoned.   The law is not so.   The law merely says, that if a tax which has been imposed has been paid, no tax can be collected again on the same article.   You are to consider the question not solely in the light of the fact that the law happened to be altered again, and the duty to be reduced from thirty-five cents to fifteen cents a pound, before the tobacco was sent to California, but also in the light of what Lilienthal did, and what his intent was, in regard to the tobacco, as bearing upon his intent in regard to the tobacco found in his possession when his establishment was seized."

12. In charging the jury that " It was a clear violation of law not to keep an account of goods manufactured (as well as of goods sold)."

13. In charging the jury that, " Unless a record be kept of goods manufactured, it is impossible for the manufacturer to comply with the law by handing in, every January, a true statement of all the goods on hand, specifying which of them were manufactured or produced by him, and which of them were purchased."

14. In charging the jury that " There are large quantities of granulated tobacco found in the order-books that are not found in the specific items in the tax-books, and large quantities of granulated tobacco returned for tax in the tax-books which cannot be identified with any specific items in the order-books. A great many items were identified, and in regard to those which could not be, you will recollect the testimony of Dennerker.   When asked, ' Where did the granulated tobacco come from which filled the orders in the order-books which cannot

be identified as items in the tax-books?' it was part, he said, of a large mass that had been entered for tax on a certain day, and taken downstairs into the retail-counter department. Under the law, that was a wholly illegal mode of doing business. Lilienthal had no right arbitrarily to take a quantity of killickinick tobacco and return it for tax, and remove it downstairs into his retail-counter department, or into any other part of his premises, and peddle it out by the pound from day to day for an indefinite period of time."

15. In entering judgment upon the verdict of the jury.

16. In entering any judgment whatever against the claimant or his property in the premises.

*Mr. Richard T. Merrick*, for Lilienthal.

*Mr. Assistant-Attorney-General Smith*, contra.

Mr. Justice Clifford delivered the opinion of the court.

Articles or objects on which duties are imposed, found in the possession, custody, or control of any person for the purpose of being sold or removed by such person in fraud of the internal-revenue laws, or with design to avoid the payment of the duties imposed, may be seized by the proper officer, as therein provided, and the provision is that the same shall be forfeited to the United States.    13 Stat. 240.

Provision is also made by the same section for the seizure by the proper officer of all raw materials found in the possession of any such person intending to manufacture the same for the purpose of sale in fraud of said laws, or with the design to evade the payment of the said duties; and also for the seizure of all tools, implements, instruments, and personal property whatsoever in the place or building or within any yard or enclosure where such articles may be found, which were intended to be used by such person in such fraudulent manufacture; and the provision is that all such articles shall also be forfeited to the United States, by a proceeding *in rem* in the Circuit or District Court in the district where such seizures were made.

Due seizure was made in this case, and it appears that at that date smoking-tobacco of all kinds, if sweetened, stemmed, or butted, was by law subject to a tax of forty cents per pound,

and that such tobacco of all kinds, if not sweetened nor stemmed or butted, including that made of stems and imitations thereof, was subject to a tax of fifteen cents per pound. 14 id. 133.

Fourteen prayers for instruction were then presented by the claimant, all of which except the last two were given to the jury.   Two prayers for instruction were presented by the prosecutor, both of which the court gave to the jury; and the claimant excepted to the rulings of the court in refusing the last two of his requests and in giving those presented by the prosecutor.

Subsequent to the charge of the court additional prayers for instructions were presented by the claimant, some of which were refused and were made the subject of exception by his counsel.   Instructions were given by the presiding justice on his own motion, and six exceptions were taken to specific portions of the charge, as set forth in the record.   Sixteen errors are assigned, embracing every exception except one taken at the trial.   They have all been examined, and, where it is deemed necessary, they will be separately considered.

1. Numbers 13 and 14 of those presented before the charge was given to the jury may be considered together, as they involve similar considerations.

Argument to prove that those requests were properly refused is not necessary, as the record shows that much evidence had been introduced by the prosecutor tending to support the allegations of the information, that the claimant had not, at the date of the seizure, paid all the taxes legally due on the tobacco manufactured at his factory, and that large quantities of tobacco there manufactured had been sold or removed from the factory in fraud of the internal-revenue laws, and with the design to avoid the payment of the taxes.   Testimony of the kind was plainly admissible, and, having been properly introduced, the question, whether it was sufficient to establish the charge, was beyond all doubt a matter for the jury, which is all that need be said upon the subject.

2. Three other errors assigned, to wit, the third, fourth, and fifth, may also be considered together, for the same reason.

Stemmed or butted tobacco was subject to a tax of forty

cents per pound, but if not stemmed or butted nor sweetened it was only subject to a tax of fifteen cents per pound.   Butted tobacco in large quantities was manufactured by the claimant; but he contended that the manufacture was still subject only to the smaller tax, even though the leaf was stemmed or butted, if the manufacturer during the process added to and intermingled with the leaf an amount of stem equal to that previously withdrawn by the process of stemming or butting: but it is clear that that theory is wholly inadmissible in this case, for the reason that the evidence does not show that an equal amount of stems was added to the leaf during the process of manufacture; nor would it be a sufficient defence in any case, for two reasons: 1. Because the practice is not warranted by the act of Congress; 2. Because it would open the door to fraud, which could seldom or never be exposed; from which it follows that tobacco stemmed or butted, even if manufactured in the manner of that theory, was subject to the higher rate of tax during all the period specified in the fourth assignment of error; nor would it benefit the claimant in this case, even if it appeared in a given case that he put back during the process of manufacture a quantity of stems as great as that which grew in the leaf.

3. Separate exceptions were taken by the claimant to the ruling of the court in giving the two instructions requested by the prosecutor, and those two rulings are the subjects of the sixth and seventh alleged errors of the court.

Suffice it to remark in this connection that the books of the claimant were introduced, and that the theory of the prosecutor was that the claimant did not make the required entries in the same, and that he kept no account for the period specified of his manufacture; that large quantities of the same during the same period were sold or removed without making any entry of the same in the books kept as those required by law for the purpose, and that no accurate account of the manufactures so removed was kept in any manner in said books; that large quantities of granulated tobacco and other descriptions were during that period sold and removed from the manufactory, and that no account of such sales and removals was kept in said books; that seventeen monthly returns were furnished to

the assistant-assessor as true and accurate abstracts of all such sales and removals, and that they were not true nor accurate statements of the manufactured products sold and removed; that the two annual inventories given in evidence were made and delivered to the assistant-assessor as true statements of the matters and things therein contained as required by law; that it appears from the evidence, as compared with the first inventory and the abstracts, that much more chewing-tobacco and fine shorts were there manufactured during that year than is stated in said abstracts; and that a large quantity of smoking-tobacco manufactured at his factory had been sold or removed during the same year which had not been returned for taxation, of which no account was given in the said abstracts or in the said books.

Enough appears to show that the prosecutor gave evidence tending to prove all of those allegations; and the court instructed the jury, pursuant to the first request of the prosecutor, that if they found those several allegations to be true, then the burden of proof is upon the claimant to satisfy the jury that the tobacco so manufactured on said premises and sold or removed without due account, return, and entry made thereof in the said books and abstracts in the manner required by law, was not so sold and removed in fraud of the internal-revenue laws and without intent to evade the payment of the taxes thereon; and if the claimant shall not have so satisfied the jury of his intent respecting the same, the jury may infer that the claimant's intent in respect of the same was fraudulent, and that his possession of the goods in the suit was with the like intent.

Prayers for instruction are properly framed in that way where the evidence to support the charge is complicated, conflicting, or of a circumstantial character, as it belongs to the jury to decide whether the facts and circumstances introduced in evidence are satisfactorily proved, and it is the province of the court to determine whether, if fully proved, they will warrant the jury in finding that the allegations which constitute the charge are established. Pursuant to that view the second request for instruction to the jury was framed in the same way.

. Preliminary to the legal proposition which the court was re-quested to adopt, the prayer presented contains a recital of the substance of the evidence given to support the charge, put hypothetically, for the consideration of the jury, appended to which is the formal part of the prayer to which the exception embodied in the seventh assignment of error is addressed. It is as follows: That if the jury believe from these facts that the claimant made the said change in the process of manu-facturing the said long smoking-tobacco and the said change in the manner of returning the same for taxation, during the specified period, for the purpose of selling and removing the same in fraud of the internal-revenue laws and with intent to evade the payment of the taxes thereon, then they would have a right to infer that the claimant had the like intent with respect to the property in suit.

Both of these instructions were given at the request of the prosecutor, and the claimant insists with much confidence that the first is erroneous, inasmuch as it declares that in the event stated the burden of proof is cast upon the claimant to show that the acts proved were not done in fraud of the internal-revenue laws; but the court is of a different opinion, for several reasons. Regulations of the kind in revenue cases have often been prescribed by Congress. Provision was made in the first collection act that in actions, suits, or information to be brought where any seizure shall be made pursuant to that act, if the property be claimed by any person, in every such case the *onus probandi*, if probable cause is shown, shall be upon such claim-ant. 1 Stat. 678; Rev. Stat., sect. 900; *Locke* v. *United States,* 7 Cranch, 339.

Rules of similar import have been incorporated into the acts of Congress providing for the collection of internal revenue, as, for example, sect. 45 of the act of the 13th of July, 1866, pro-vided that proceedings in seizures shall be according to existing provisions of law in relation to distraint and in conformity with the regulations of the commissioner, and that the burden of proof shall be upon the claimant of said spirits, to show that the requirements of law in regard to the same have been com-plied with. 14 Stat. 163.

Equally stringent provision in respect to distilled spirits is

contained in the subsequent act, which was in force at the date of the transactions involved in the prosecution. 15 id. 140. By that enactment it is provided that the burden of proof in the described cases shall be upon the claimant of said spirits, to show that no fraud has been committed and that all the requirements of the law in relation to the payment of the tax have been complied with, which is substantially the same as the provision in the prior act.

In criminal cases the true rule is that the burden of proof never shifts; that in all cases, before a conviction can be had, the jury must be satisfied from the evidence, beyond a reasonable doubt, of the affirmative of the issue presented in the accusation that the defendant is guilty in the manner and form as charged in the indictment. *Commonwealth* v. *McKie*, 1 Gray (Mass.), 64; *Same* v. *York*, 9 Metc. (Mass.) 125; *Same* v. *Webster*, 5 Cush. (Mass.) 305; *Same* v. *Eddy*, 7 Gray (Mass.), 584; Bennett & Heard, Lead. Cr. Cas. 299.

Text-writers of the highest authority state that there is a distinction between civil and criminal cases in respect to the degree or quantum of evidence necessary to justify the jury in finding their verdict. In civil cases their duty is to weigh the evidence carefully, and to find for the party in whose favor it preponderates; but in criminal trials the party accused is entitled to the legal presumption in favor of innocence, which, in doubtful cases, is always sufficient to turn the scale in his favor. 3 Greenl. Evid. (8th ed.), sect. 29; 1 Taylor, Evid. (6th ed.) 372.

Beyond question, the general rule is that the burden of proof in civil cases lies on the party who substantially asserts the affirmative of the issue, but the burden may shift during the progress of the trial. Possession of a negotiable instrument payable to bearer or indorsed in blank is *prima facie* evidence that the holder is the proper owner and lawful possessor of the same; but if the defendant prove that the instrument was fraudulent in its inception, or that it had been lost or stolen before he became the holder, the burden of proof is changed, and the *onus* is cast upon the plaintiff to prove that he gave value for it when he became the holder. *Collins* v. *Gilbert*, 94 U. S. 753.

Examples of like character almost without number might be given ; but it is unnecessary, as every one knows that the plaintiff in every case may safely rest when he has introduced proof to make out a *prima facie* case.   Authorities to show that the case before the court is a civil case are scarcely necessary, but if any be needed they are at hand.   1 Bishop, Cr. Law (6th ed.), sect. 835 ; *United States* v. *Three Tons of Coal,* 6 Biss. 371; *Schmidt* v. *Insurance Company,* 1 Gray (Mass.), 533 ; *Knowles* v. *Scribner,* 57 Me. 497;

Speaking of a proceeding *in rem* to forfeit spirituous liquors, the Supreme Court of New Hampshire say that it is only when some crime or misdemeanor is charged upon an individual that all reasonable doubt of the guilt of the accused must be removed ; but here no one is accused of any crime, as it is not a proceeding against any person.   Such being the character of the proceeding and of the character of the trial, the claimant may appear by attorney, may make and sign his claim by attorney, may file his plea in writing and sign it by attorney; issues may be joined, claims and pleas amended, verdict rendered on the issues, judgment rendered on the verdict, costs allowed the prevailing party, and execution for cost issued. *State* v. *Spirituous Liquors,* 47 N. H. 375 ; *Cooper* v. *Slade,* 6 H. of L. Cas. 772.

Innocence is presumed in a criminal case until the contrary is proved ; or, in other words, reasonable doubt of guilt is in some cases of the kind ground of acquittal, where, if the probative force of the presumption of innocence were excluded, there might be a conviction ; but the presumption of innocence as probative evidence is not applicable in civil cases nor in revenue seizures, as, for example, when a railroad company is sued in damages for negligence, the issue depends upon the evidence, without any presumption of innocence or guilt, but the company is not put to defence until a *prima facie* case of negligence is made out by the plaintiff; but when such a case is made out, courts do not instruct juries that if there is reasonable doubt as to negligence they must find for the defendant, as such an instruction would be a plain error.   Issues of the kind, however, must be proved at least *prima facie;* and if the defendant fails to overcome the *prima facie* case,

the jury, if they deem it reasonable, may find for the plaintiff.   2 Whart. Evid., sect. 1245; *Gordon* v. *Parmelee*, 15 Gray (Mass.), 415.

High authority supports the proposition that when a presumption of fact exists against a party in a case of seizure *in rem*, the court may instruct the jury that the burden is on such party to remove the presumption, and that if he does not, the case must, in an issue in a civil case, go against him on such point.   1 Whart. Evid., sect. 371.

Whenever evidence is offered to the jury which is in its nature *prima facie* or presumptive proof, its character as such ought not to be disregarded; and no court has a right to direct a jury to disregard it, or to view it under any different aspect from that in which it is actually presented.   *Crane* v. *Morris et al.*, 6 Pet. 598.

*Prima facie* evidence of a fact, says Mr. Justice Story, is such evidence as in judgment of law is sufficient to establish the fact, and, if not rebutted, remains sufficient for the purpose. 6 id. 632; *United States* v. *Wiggins*, 14 id. 334.

Suffice it to say, that the observations already made are sufficient to dispose of the exception to the ruling of the court in giving the second request presented by the prosecutor, without further examination.

4. The next error assigned is the eighth, which is that the court erred in charging the jury that the Orinoco tobacco, so called, would have been liable to a tax of thirty-five cents per pound; but the court here is of a different opinion.

Goods might be manufactured without being subject to tax, even if they were intended for sale, unless they were sold, consumed, or removed from the manufactory.   13 Stat. 264, sect. 94.

Articles, goods, &c., except where otherwise provided, which shall be produced and sold, or be manufactured or made and sold, or be consumed or used by the manufacturer or producer, or be removed for consumption or for delivery to others than agents within the United States, are declared by that section to be subject to such taxation.

Manufactured tobacco under that act, if made of the leaf with the stem taken out, or if sweetened, was subject to a duty

of thirty-five cents.  Smoking-tobacco manufactured of leaf not stemmed, butted, or stripped was subject to a tax of twenty-five cents per pound.

Before the transaction referred to took place, the amendatory act of the 13th of July, 1866, was passed, which increased the rate of taxation on tobacco of the first-named class to forty cents per pound.   Desiring to avoid the payment of the increased tax, the claimant executed the plan of a fictitious sale of a large quantity of tobacco which he had on hand, as a means of effecting that purpose.   His own testimony explains the matter in substance and effect as follows : That the goods were never delivered to the purchasers, so called, and were never intended to be delivered, nor were they removed from his factory ; that it was understood between him and those merchants that the goods were sold and bought back, and that he believed, though he was not positive about it, that he exchanged checks with them for the amount of the bill; that the proceeding was for the purpose of returning the tobacco as sold in his current monthly return for taxation, in order to avoid payment of the increased rate of duty to which the same would be liable when the new revenue act took effect.

Sales of personal property merely colorable, made with the intention that the title should not be transferred in reality but only in appearance, convey no title whatever to the apparent purchaser.  *Hyam's Case*, 1 De G., F. & J. 79 ; *Bowes* v. *Foster*, 2 H. & N. 783 ; *Cox* v. *Jackson*, 6 Allen (Mass.), 109.

Throughout, the title was undeniably in the claimant; and if the tobacco was goods in his possession, it is clear that it was subject to taxation under the new revenue act, as the new act, if the duty imposed by either of the two preceding acts had not been paid, provides that all manufactures and productions on which a duty was imposed by either of the preceding acts, repealed by that act, in the possession of the manufacturer or producer, or of his agent or agents, on the day when that act takes effect, shall be held and deemed to have been manufactured or produced after that date.   14 Stat. 173, sect. 70.

Viewed in the light of these suggestions, it is plain that the

instruction given is correct, and that the assignment of error must be overruled.

5. Though slightly different, the ninth, tenth, and eleventh errors assigned will be re-examined together.

Speaking of the fictitious sale, and the intent it was expected to accomplish, the judge remarked to the jury that it was his duty to say to them that the transaction was utterly illegal; in which the court here fully concurs. Coupled with the averred motive of the actor, it is clear that it was illegal to return the tobacco for taxation, for the reason that it had not been sold nor removed for consumption, nor indeed for any purpose, as it remained in the manufactory. Where the evidence is without conflict, and the facts are conceded or fully proved, it is a question of law whether they show a perfected sale. *Cutler* v. *Bean*, 34 N. H. 299; *Burrows* v. *Stebbins*, 26 Vt. 663; *Kaine* v. *Weigley*, 22 Pa. St. 183.

Persons engaged in the manufacture of such products are required to keep books, and to keep an account of goods manufactured and sold or removed; and the evidence showed in this case that the claimant did not in certain instances comply with those requirements, — which is a sufficient answer to the tenth assignment of error. Nor is it necessary to add any thing to show that the eleventh assignment of error is without merit, beyond what was remarked in response to the complaint set forth in the eighth assignment. Nor is it necessary to enter into any discussion of the twelfth assignment of error, as the remarks made respecting the ninth and tenth assignments apply with equal force to that ground of complaint.

6. Thirteen and fourteen of the errors assigned may also be classed together without inconvenience.

In the first of the two the complaint is that the judge remarked to the jury that, unless a record be kept of the manufactured goods, it is impossible for the manufacturer to comply with the requirements of law in respect to his returns. Such manufacturers are required by law to keep books; and if they fail to do that, and keep no record of their daily transactions, the expression of the judge is scarcely too strong, and was not one calculated to mislead the jury.

Quantities of granulated tobacco entered in the order-books

were not in the tax-books, so called, and large quantities entered in the tax-books could not be identified in the order-books, which a witness, when asked to explain the transaction, said it was part of a large mass taken downstairs into the retail department: and the complaint is that the judge remarked that it was an illegal mode of doing business, but such a remark can hardly be regarded as the subject of error when considered in connection with the full charge given to the jury; nor was the remark without justification, as the tobacco had not been returned for tax, as is admitted in the assignment of error.

7. Nothing need be remarked in response to the fifteenth and sixteenth assignment of errors, as the only complaint they contain is that the judgment is for the wrong party.

Suggestion was made during the argument at the bar that the court erred in not instructing the jury that they could not find that the property was forfeited unless the matters charged were proved beyond a reasonable doubt; but no such exception was taken at the trial, nor is any such complaint set forth in the assignment of errors; nor is there any thing in the case of *Chaffee* v. *United States* (18 Wall. 516) which conflicts in the least with the views here expressed, as is obvious from the fact that the two cases are radically different, the present being an information against the property, and the former an action against the person to recover a statutory penalty. Informations *in rem* against property differ widely from an action against the person to recover a penalty imposed to punish the offender. But they differ even more widely in the course of the trial than in the intrinsic nature of the remedy to be enforced.

Instructions of an entirely different character were given in that case, as, for example, the jury were told in effect that suspicious circumstances requiring explanation, if not explained, would supply by presumption what would be sufficient to warrant a verdict of guilty; that silence supplied, in the presumption of law, that full proof which should dispel all reasonable doubt, — making the inference to be drawn from silence one of law instead of fact. Palpable as those errors were, it is clear the decision of this court is correct.

Nor is there any thing in the case of *United States* v. *The Brig Burdett* (9 Pet. 682) that is in conflict with these several propositions. Charges of the kind contained in an information ought to be satisfactorily proved; and it is correct to say that if the scale of evidence hangs in doubt, the verdict should be in favor of the claimant, which is all that was there decided. Jurors in such a case ought to be clearly satisfied that the allegations of the information are true; and when they are so satisfied of the truth of the charge, they may render a verdict for the government, even though the proof falls short of what is required in a criminal case prosecuted by indictment. *Insurance Company* v. *Johnson*, 11 Bush (Ky.), 593.

*Judgment affirmed.*