## TINSLEY et al. v. UNITED STATES.
### No. 8796.

Circuit Court of Appeals, Eighth Circuit.
Sept. 26, 1930.

Harry P. Atwater, of Sturgis, S. D. (Percy H. Helm, of Sturgis, S. D., on the brief), for appellants.

Byron S. Payne, Asst. U. S. Atty., of Pierre, S. D. (Olaf Eidem, U. S. Atty., and Frank G. McCormick, Asst. U. S. Atty., both of Sioux Falls, S. D., on the brief), for the United States.

Before KENYON, BOOTH, and GARDNER, Circuit Judges.

KENYON, Circuit Judge.

Appellants, Chester B. Tinsley, William Shepherd (Shepard), and John Reed, were indicted, together with Paul Widow and Philip Lone Eagle, in the District Court of the United States for South Dakota, on eight counts. The first seven counts charged the larceny of certain horses within the boundaries of the Cheyenne Indian Reservation. The eighth count charged a conspiracy to do the things alleged in the first seven counts. The conspiracy count is based upon section 37 of the Criminal Code (18 USCA § 88); the other counts on section 329 of the Criminal Code (18 USCA § 549), which relates to crimes committed on Indian reservations in South Dakota.

Upon motion of the district attorney during the trial the indictment was nolle prossed as to Paul Widow and Philip Lone Eagle.

At the close of the evidence a motion was submitted on behalf of defendants Reed and Shepherd to direct the jury to return a verdict of not guilty, because of the insufficiency of the evidence to establish guilt on the various counts, emphasizing especially a want of evidence to connect Shepherd and Reed with any conspiracy. This motion was denied.

The jury found appellants guilty as charged in the indictment. No separate verdicts on different counts were rendered, but under the instructions of the court the jury could have convicted or acquitted on any sep-

arate count. The verdict therefore stands as one of guilt on every count. The sentences meted out by the court were more severe as to Tinsley than as to the other appellants.

We consider first the question of the sufficiency of the evidence to establish the conspiracy charged in count 8.

Where two or more persons enter into an agreement to commit a crime against the United States, and in pursuance thereof an overt act is done to effect the object of the agreement, an indictable conspiracy is established. Fisher v. United States (C. C. A.) 2 F.(2d) 843; Baker v. United States (C. C. A.) 21 F.(2d) 903; Eddington v. United States (C. C. A.) 24 F.(2d) 50; Stephens et al. v. United States (C. C. A.) 41 F.(2d) 440; Williamson v. United States, 207 U. S. 425, 28 S. Ct. 163, 52 L. Ed. 278.

In Linde et al. v. United States, 13 F.(2d) 59, 61, this court has gone pretty thoroughly into the question of conspiracy. It was held there that where defendants were charged with being parties to a general plan or conspiracy having as its object the introduction of stolen cars from without the state for the purpose of disposition and sale, the evidence must convince that they did something more than participate in the substantive offense which was the object of the conspiracy. The court said, "There must, in addition thereto, be proof of the unlawful agreement, and in this case, in our judgment, that proof is insufficient," citing a number of cases. In Graham v. United States, 15 F.(2d) 740, 742, this court discusses the question of the sufficiency of the evidence to show conspiracy, and points out that conspiracy is a distinct offense from the crime which may be the object of the conspiracy, and states that "there must be shown to be a combination or understanding, tacit or otherwise, to violate a federal statute." It was held the evidence was not sufficient to show a conspiracy, although one or more of the defendants were guilty of overt acts, but that two or more did not conspire to commit them. In a conspiracy there must be some unity of purpose, some common design and understanding, some meeting of minds in an unlawful arrangement, and then to make the conspiracy a crime the doing of some overt act to effect its object. A person does not become a part of a conspiracy by knowledge that another is about to commit a crime, or necessarily by an acquiescence in the crime.

There may be certain connections of defendants with transactions claimed to be criminal which would come under the reference of Justice Holmes in United States v. Holte, 236 U. S. 140, 35 S. Ct. 271, 272, 59 L. Ed. 504, L. R. A. 1915D, 281, to wit, a "degree of co-operation that would not amount to a crime." Such degree of co-operation might be approval or even encouragement, inactive acquiescence, and other matters which did not enter into the real plan or design of the alleged conspirators. Hyde and Schneider v. United States, 225 U. S. 347, 32 S. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614; United States v. Heitler et al. (D. C.) 274 F. 401.

Tinsley without question was the main offender in the atrocious business of having horses stolen by those employed to do so (evidently ignorant Indians), then killing the horses, skinning them, and feeding the carcasses to his hogs. He had been accustomed, according to the evidence, to utilize horses to feed his hogs, and the testimony shows that he purchased many horses for that purpose. The evidence here, which it might be argued shows a conspiracy, was that furnished by Paul Widow and Philip Lone Eagle. The evidence of Philip Lone Eagle, a Sioux Indian, was that Tinsley employed him to get any kind of horses he could from the reservation, to bring them to his ranch on stormy days or during the night; that he was to be paid $2 or $2.50 a head therefor; that if he got caught stealing horses Tinsley would back him up and help him out; that he did steal a large number of horses, which were delivered to Tinsley, who butchered them, cut them up, and put them in the feed lot; that part of his pay was in whisky.

Paul Widow, an Indian from the Cheyenne River Indian Reservation, testified that he was employed by Tinsley to pick up unbranded horses and deliver at Tinsley's place, for which he was to receive $2 per head. Tinsley gave him the same instructions that he gave to Lone Eagle, and warned him to keep his mouth shut, that he would protect him, and if he gave out any information as to what Tinsley was doing on his place he would be a dead Indian. Under his arrangement with Tinsley Paul Widow stole a large number of horses on the Cheyenne Indian Reservation, delivered them in the night or on rainy days to Tinsley's ranch, and helped butcher them. The part of the animal bearing the brand would be cut out and cut up into small strips and thrown into the hog lot. While Paul Widow and Philip Lone Eagle did a large business in stealing horses for Tinsley, there is no evidence in the record to connect them in the work each was respectively doing. They were not working together

or carrying out any arrangement to which both were parties. There is no evidence to show that Philip Lone Eagle had any knowledge whatever of the arrangement which Tinsley had with Widow or that Widow knew of Tinsley's arrangement with Philip Lone Eagle, nor is there anything to connect Shepherd and Reed with participation in any conspiracy between Tinsley, Philip Lone Eagle, and Paul Widow. The enterprise seems to have been a one-man affair, established by Tinsley and carried on by him with the aid of other parties. We are forced to the conclusion that the evidence does not show any mutual understanding or plan whereby appellants and Paul Widow and Philip Lone Eagle were to co-operate in the stealing of horses from the Indian Reservation, nor that the minds of these parties met understandingly to carry out a deliberate agreement to commit the larcenies charged in the indictment. The evidence does tend to show a conspiracy between Tinsley and Widow, and a conspiracy between Tinsley and Philip Lone Eagle, but they are separate and distinct conspiracies and not the conspiracy charged in the indictment. This is not sufficient. Terry v. United States (C. C. A.) 7 F.(2d) 28; Wyatt et al. v. United States (C. C. A.) 23 F.(2d) 791; Stubbs v. United States (C. C. A.) 249 F. 571.

The evidence is insufficient to warrant the conviction of Shepherd and Reed on the eighth or conspiracy count, and their motion at the close of the evidence to instruct a verdict of not guilty should have been sustained as to that count.

Even though no motion was made by Tinsley for an instructed verdict, as the evidence was insufficient to sustain the conspiracy count of the indictment, we are compelled to hold that his conviction on that count cannot stand. 5 Ruling Case Law, p. 1078, § 23; Williamson v. United States, 207 U. S. 425, 28 S. Ct. 163, 52 L. Ed. 278.

It is urged that the court erred in not sustaining a motion to strike all evidence of certain witnesses as to the stealing of horses not described in the indictment; also evidence as to bones, hides, and as to the barter of liquor by Tinsley; also that certain exhibits which were introduced should have been stricken, one exhibit particularly being the list or description of the hides and brands, together with statement of the witness Brewer as to whether the brands had been slashed or mutilated; that this exhibit included animals and hides not charged in the indictment, and was evidence of other larcenies, and that as no conspiracy was shown all of such evidence should have been excluded. While this motion made at the close of the evidence does not point out the particular evidence to be stricken, and is entirely too general for consideration by an appellate court, we have, in view of the importance of the case, considered the same and think most of said evidence sought to be excluded was admissible, even absent the theory of conspiracy.

The law is well settled as to the introduction of evidence of other offenses in the trial of a criminal case, and this court has many times expressed itself thereon. If no question of a defendant's intent is involved, unless there is some connection between such offenses and those charged, it is manifestly unfair and unjust that evidence of like offenses to those charged in the indictment should be introduced. In Cook v. United States, 14 F.(2d) 833, 834, this court said: "Evidence may not be admitted of other alleged crimes not related to the offense under trial, except where intent is an essential ingredient, or the subject of inquiry is so related to the main offense as to throw material light thereon." Anderson v. United States (C. C. A.) 18 F.(2d) 404; Johnston v. United States (C. C. A.) 22 F.(2d) 1; Niederluecke et al. v. United States (C. C. A.) 21 F.(2d) 511; McMillan et al. v. United States (C. C. A.) 27 F.(2d) 94; Heglin v. United States (C. C. A.) 27 F.(2d) 310; Doyle et al. v. United States (C. C. A.) 33 F.(2d) 265; Sargent v. United States (C. C. A.) 35 F.(2d) 344.

The question of intent is in this case. Each of the first seven counts of the indictment charges the taking and purloining of horses with intent to deprive the owners of their property. It was necessary to show that the purchase of the horses by Tinsley for the larceny of which he is charged was not a mistake and was not in good faith. Therefore the evidence of other similar larcenies was admissible as bearing on the question of intent, and the court in its instructions carefully pointed out to the jury that it could be considered only for that purpose.

[8] An acquittal on the conspiracy count does not prevent prosecution or conviction on the other seven counts, each of which charges a substantive offense. Bell v. United States (C. C. A.) 2 F.(2d) 543.

This brings us to the important question of whether the evidence was sufficient to establish the guilt of appellants on the first seven counts. This question as to Tinsley

894

is really not before us, as no motion was made as to him. Edwards v. United States (C. C. A.) 7 F.(2d) 357; Anderson v. United States (C. C. A.) 264 F. 75.

We can well understand from a study of this record that none would have the temerity to suggest that the evidence as to Tinsley's guilt of the offenses charged in the first seven counts was not overwhelming. Some suggestion is made that the evidence was that of accomplices and was not corroborated. However, conviction may be based on the testimony of accomplices alone if the jury believes it to be true. Waldeck et al. v. United States (C. C. A.) 2 F.(2d) 243; Webb et al. v. United States (C. C. A.) 8 F.(2d) 145; Heglin v. United States (C. C. A.) 27 F.(2d) 310; Caminetti v. United States, 242 U. S. 470, 37 S. Ct. 192, 61 L. Ed. 442, L. R. A. 1917F, 502, Ann. Cas. 1917B, 1168. He was found in recent possession of much stolen property. Two Indians testify they stole at his direction. He had been warned by a government farmer in 1927 that Widow and Lone Eagle were stealing horses and that he should inspect the horses he bought. He did not do so, but kept on in his iniquitous work. The testimony shows that hides from these stolen horses had the brands cut out or were slashed and mutilated. When Tinsley was arrested after the discovery of his operations, he failed to appear in the preliminary criminal prosecution and forfeited his bond. There is no necessity of spending further time on Tinsley.

As to defendant Shepherd the evidence is not so strong, but nevertheless we think it sufficient to warrant his conviction as an accessory to the crimes of Tinsley, as charged in the first seven counts of the indictment. Shepherd worked at the Tinsley ranch from September 5, 1928, to March, 1929. During that time it appears that horses, which were being brought in by the two Indians, Widow and Lone Eagle, were being killed and fed to the hogs nearly every day. Shepherd helped to butcher and skin these horses and to mutilate and conceal the brands, which is the most condemnatory evidence against him. Widow testifies that he saw Shepherd cut out the brands and cut them into small strips and throw them into the hog yard; that he talked with Shepherd about these deliveries of horses. We quote from his testimony:

"Bill Shepard was there when I delivered horses to Tinsley's ranch in the fall of 1928. He would help butcher and skin horses when I delivered them in 1928. Would deliver sometimes a week and sometimes it would take me two weeks to make another delivery. Shepard helped at all times. I saw Shepard cut out brands. It would be cut up in small strips and pieces and thrown over in the hog yard. He lives at the Tinsley ranch. He came there right after I left in August, 1928, and stayed throughout 1928. I have talked to him about the horse deliveries I was making. He told me he was riding for Tinsley and he would accept the horses that I would bring in there."

The purpose of the brand on an animal was to indicate ownership. Removing or mutilating it could be only for the purpose of concealing such ownership. It is apparent that Shepherd was actively and knowingly aiding and abetting Tinsley in the larcenies charged.

As to defendant Reed, the situation we think is somewhat different. Reed worked for Tinsley at two different periods. In January and February, 1927, at his ranch, and again from January, 1929, to March, 1929. There is testimony that he helped butcher some horses in the spring of 1927; also in July and August of that year. Widow testified that Reed did not participate in any of the butchering in 1929. Lone Eagle testified that on January 8, 1929, Reed was present when he delivered certain horses to Tinsley; that Tinsley shot the horses and he skinned them and Shepherd cut out the brand. There is no evidence that Reed ever cut out the brands or mangled the hides to conceal brands. He did not assist in the killing of any of the horses referred to in the indictment, but did help in getting the skins off two or three times, and was hauling one of the loads of hides from Tinsley's ranch to Gettysburg, which was intercepted by officials. That covers the evidence to Reed, except the Merle Kelley matter.

The evidence shows that one Merle Kelley had filed charges in the state court against Tinsley for stealing horses, and that a warrant had been issued for his arrest. Reed, who was a long-time friend of Kelley, went to him to see if the charge could not be dropped if Tinsley paid for the horses. He did not offer him money. No warrant had been issued for Reed, and as far as the record shows he was in no way connected with the transaction. Reed explains in his testimony that he was sent to Kelley by Mrs. Tinsley, that she gave him a list of checks that Tinsley had paid to Wayne Kelley, brother of Merle Kelley, that he had no personal interest in it, but was trying to see if the matter could be settled because Mrs. Tins-

ley asked him to. We do not understand that this matter relates to any of the charges in the indictment. Reed was given a short sentence by the trial court, the court apparently recognizing that the testimony as to him was not so convincing as it was concerning the other appellants.

■ While the evidence of Reed's conversation with Kelley unexplained gives rise to some suspicion, his explanation of it is entirely consistent with innocence. Counsel for Reed attempted to use Lula Tinsley, wife of appellant Tinsley, as a witness to explain that she sent him to Kelley to try and secure an adjustment of the case against her husband. She was offered as a witness solely in behalf of Shepherd and Reed. Objection was made by the district attorney, on the ground that as this was a joint trial, the wife of one of the defendants could not be a witness in favor of other defendants. The objection is based on the theory that she was not competent because under the common-law rule as it existed in 1789 the wife was not a competent witness in a criminal case for or against her husband or a codefendant of her husband. There is nothing in her proffered testimony as to Shepherd that is not fully covered by other practically undisputed testimony; hence if such testimony was admissible its exclusion would not constitute prejudicial error as to Shepherd.

■ We think, however, that Reed was entitled to the evidence of Mrs. Tinsley and that it was error to exclude it. The strongest circumstance against Reed was the fact that he had gone to Merle Kelley apparently seeking to adjust a larceny charge that had been filed against Tinsley in a state court, and on which Tinsley had been arrested. While Mrs. Tinsley's proffered testimony was somewhat cumulative, it strengthened Reed's explanation of the Kelley transaction and would have more weight with the jury than his own statement. She was not offered as a witness in behalf of her husband, but solely in behalf of Shepherd and Reed. Her proffered testimony would not in any way assist in her husband's acquittal. The rule of the common law was that the wife of a defendant could not be a witness in a criminal case for a codefendant if her testimony would tend directly to her husband's acquittal. 1 Greenleaf on Evidence, §§ 334 and 335. The precise question here is the right of the wife of a defendant to testify in favor of a codefendant in a matter that cannot assist or injure her husband in any way. There was no effort to have her testify in favor of her hus-

band but for a codefendant. If the ancient rule of the common law as to a wife not being permitted in a criminal case to testify in favor of her husband should be recognized, nevertheless it would be inapplicable to the situation here presented.

In view of this conclusion it is unnecessary for us to pass on the general question of the wife's competency or incompetency in the federal courts as a witness for her husband under the rules of the common law, or as affected by the statutes of the territory of South Dakota at the time of its admission as a state. See Olmstead et al. v. United States, 277 U. S. 438, 48 S. Ct. 564, 72 L. Ed. 944, 66 A. L. R. 376. We venture far enough, however, into the confused domain of the incompetency of witnesses under the common law and the applicability of common-law rules on the subject to present conditions of affairs to suggest that practically all of the common-law disabilities of husband and wife have been swept aside in nearly all the states of the union. In this day and age when a married woman is exercising every civil and political right and when the world is progressing toward a more enlightened administration of justice, to say that a wife cannot testify in favor of her husband in a criminal case because of some rule of the common law of 1789, which should be obsolete, is in the opinion of the writer an absurdity and a relic of legal barbarism which should not longer be recognized. Such rule does not fit present conditions. Should we enter this field, however, it would be most difficult to harmonize the decision of the United States Supreme Court in Rosen et al. v. United States, 245 U. S. 467, 38 S. Ct. 148, 150, 62 L. Ed. 406, where the court considered the question of disqualification of a witness who had been convicted of a felony, and said, "we conclude that the dead hand of the common-law rule of 1789 should no longer be applied to such cases as we have here," and the language of Justice Holmes in Greer v. United States, 245 U. S. 559, 561, 38 S. Ct. 209, 210, 62 L. Ed. 469, "It is argued that the Court was bound by the rules of evidence as they stood in 1789. That those rules would not be conclusive is sufficiently shown by Rosen v. United States, 245 U. S. 467, 38 S. Ct. 148, 62 L. Ed. 406," with the decision of the Supreme Court in Jin Fuey Moy v. United States, 254 U. S. 189, 195, 41 S. Ct. 98, 101, 65 L. Ed. 214, where the court said: "But a single point remains—hardly requiring mention—the refusal to permit defendant's wife to testify in his behalf. It is conceded that she was not a competent witness

for all purposes, a wife's evidence not having been admissible at the time of the first Judiciary Act, and the relaxation of the rule in this regard by sec. 858, Rev. Stat. U. S., being confined to civil actions. Logan v. United States, 144 U. S. 263, 299–302, 12 S. Ct. 617, 36 L. Ed. 429; Hendrix v. United States, 219 U. S. 79, 91, 31 S. Ct. 193, 55 L. Ed. 102. But, it is said, the general rule does not apply to exclude the wife's evidence in the present case because she was offered not 'in behalf of her husband,' that is, not to prove his innocence, but simply to contradict the testimony of particular witnesses for the government who had testified to certain matters as having transpired in her presence. The distinction is without substance. The rule that excludes a wife from testifying for her husband is based upon her interest in the event, and applies irrespective of the kind of testimony she might give." The Rosen Case certainly establishes the doctrine that the courts are not conclusively bound as to competency of witnesses by the rules of the common law as they stood in 1789.

If the dead hand of the common-law rule of 1789 as to the incompetency of witnesses who had once been convicted of crime should no longer be applied, it is difficult to see why it should be applied in favor of the absurd proposition that a husband or wife cannot testify in favor of one another. It would seem a strange administration of justice that if a wife were the only witness who could show the innocence of her husband when he was accused of some serious crime in the federal court that her mouth must be sealed on account of some ancient doctrine that a wife should not be permitted to testify because of identity of interest or interference with domestic happiness, or for any of the other reasons, which Wigmore in his Law of Evidence, vol. 1, §§ 600 and 601, sets forth and makes light of. He calls the rule a misguided one of the common law. Domestic happiness would seem to be invaded to as great an extent by having a husband executed for murder or sent to the penitentiary, as to have the wife testify to matters which might show his innocence, even though some family transactions were disclosed. We are aware that this court has in Adams v. United States, 259 F. 214, 215, held that a husband could not be sworn as a witness in his wife's favor, in which case Judge Stone dissented in part as follows: "Where both husband and wife voluntarily waive this confidence and desire the disclosure, not only does the sole basis of the rule, and therefore the rule itself, vanish, but

there comes into force the cardinal consideration of presenting to the jury all possible information bearing upon the issues in the case. It may be entirely proper to hold that the preservation of the close marriage relation by strict protection of its confidences is more important than the procurement of conviction by evidence obtained through the rupture of that confidence, so basic in our civilization. I cannot conclude that such a purpose is consummated by closing mouths which both husband and wife wish opened to prove lack of criminality by either. Is the marriage relation or is society benefited by preventing a husband or wife from thus coming to the aid of the other in a time of dire need, and to promote justice?"

In Maxey v. United States, 207 F. 327, this court held that a person convicted of a felony was incompetent as a witness in a criminal case in a United States court because disqualified at common law, Congress not having changed the common-law rule, and that the removal of the disqualification must come through congressional action. This was before the Rosen Case, supra, and is out of harmony with it.

In Hurwitz v. United States, 299 F. 449, this court followed the Rosen Case, and held that parties who had been convicted of felonies were not disqualified as witnesses in the federal court. It is to be noted that this particular disqualification under the common law was changed by the Rosen Case, and followed by this court without any action of Congress, and these two later cases practically destroy the force of the Maxey Case.

In Johnson v. United States, 221 F. 250, this court held that a wife was not a competent witness against her husband, as under the common law neither husband nor wife could testify against the other, and there had been no change in the rule by act of Congress. Of course the distinction between disqualification of a husband or wife to testify for one another and the privilege not to testify against one another is clear. We are not discussing the question of privilege.

In Neal v. United States, 1 F.(2d) 637, 639, this court has taken a forward step and said, with reference to the rules of evidence in a territory at the time it was admitted as a state being recognized by the federal courts, that they "are not to be inflexibly applied in the federal courts of that district, but are subject to modification from time to time as the trend of judicial authority and legislative enactment require." The court also said, page 638 of 1 F.(2d), "The rules of evidence

governing federal courts in criminal cases arising in that district are those which were in force in Oklahoma Territory at the time of the admission of Oklahoma as a state." See also Withau v. United States (C. C. A.) 127 F. 530.

We have felt justified in venturing slightly into this field because it is apparent that unless Congress passes some act making husband and wife competent to testify as witnesses for each other in the federal courts or unless the Supreme Court passes on the question in such a way as to harmonize the Rosen and Jin Fuey Moy Cases, supra, that many of the federal courts will refuse to follow this antiquated and fossilized rule of the common law, on the theory that if there ever was any reason for the same it has long since ceased to exist. Indeed, the Circuit Court of Appeals of the Ninth Circuit, in Rendleman v. United States, 18 F.(2d) 27, 28, attempts to distinguish the Jin Fuey Moy Case from the Rosen Case, on the theory that the Jin Fuey Moy Case is applicable only to Pennsylvania, "where the wife's evidence was not admissible at the time of the first Judiciary Act," and "that it was not intended by the Jin Fuey Moy Case to depart from the broader rule laid down in the Rosen decision, where the question was disposed of by overruling the common law practice." The court in the Rendleman Case holds in accordance with the general doctrine of the Rosen Case, refusing to be governed by the rule of the common law that a wife was not a competent witness in behalf of the husband.

In the Fourth Circuit, in Krashowitz v. United States (C. C. A.) 282 F. 599, and in Fisher v. United States (C. C. A.) 32 F.(2d) 602, it was held that on the authority of the Jin Fuey Moy Case defendant's wife could not testify in his behalf. Some other circuits have considered themselves likewise bound by the same case. We conclude our perhaps unnecessary excursion into this realm of doubt by a quotation from an article by W. Barton Leach, of the Harvard Law School, entitled, "State Law of Evidence in the Federal Courts," which was published in the Harvard Law Review, and was inserted in the Congressional Record June 9, 1930, reviewing all the leading cases on this subject from the initial one of United States v. Reid, 12 How. 361, 13 L. Ed. 1023, down to the Jin Fuey Moy Case:

"Where are we now? An attempt to reconcile a line of authorities in which some later cases have been decided without reference to or apparent thought of earlier ones is probably futile mental gymnastics. It may be suggested, however, that the law of the respective states as of 1789 (United States v. Reid) or the date of admission of the State (Logan v. United States, 144 U. S. 263, 12 S. Ct. 617, 36 L. Ed. 429) is applicable in the Federal criminal courts except so far as State legislation or judicial decisions have established a weight of authority in favor of a more modern view (Rosen v. United States). Jin Fuey Moy v. United States can only be explained as an oversight with regard to a minor point in the case, or as an acceptance by the court of an improvident concession of counsel.

"With good reason the lower Federal courts confess their perplexity. Faced with the patent inconsistency of the Rosen and Jin Fuey Moy Cases, most of them take the easiest path by ruling that the latter decision establishes a uniform Federal rule that the wife of a criminal defendant is not competent in his behalf, and that the former establishes a uniform Federal rule admitting convicted felons. These courts habitually fail to refer to the law of the State in which the court was sitting in 1789 or at the time of the admission of the State into the Union. So far as these cases exclude the wife as a witness in States which prior to admission had passed statutes qualifying the wife as a witness, an erroneous result seems to have been reached. At least one court seems to think that the Reid and Logan Cases are still in full force. And some apply their view of the general weight of common-law authority without reference to any particular State. An examination of cases cited in the footnotes to this paragraph will indicate that at least one circuit court of appeals has assumed three inconsistent positions on this matter in the course of 10 years."

While we hold that the court erred in not permitting Mrs. Tinsley to testify in favor of Reed, in view of another trial we deem it proper to say that the evidence in this record as to Reed, with the addition of the proffered testimony of Mrs. Tinsley, is as consistent with innocence as with guilt, and even without the explanation of the Kelley transaction by Mrs. Tinsley we should doubt if the evidence was sufficient to warrant the conviction of Reed. It is the well-established rule of this court that if the evidence in a criminal case as a whole is as consistent with innocence as with guilt conviction should not be sustained, and, "unless there is substantial evidence of facts which exclude every other hypothesis but that of

898

guilt, it is the duty of the trial court to instruct the jury to return a verdict for the accused; and where all the substantial evidence is as consistent with innocence as with guilt, it is the duty of the appellate court to reverse a judgment of conviction." Wright v. United States (C. C. A.) 227 F. 855, 857; Turinetti v. United States (C. C. A.) 2 F. (2d) 15; Edwards v. United States (C. C. A.) 7 F.(2d) 357; Ridenour et al. v. United States, 14 F.(2d) 888 (C. C. A. 3rd Circuit); Haning v. United States (C. C. A.) 21 F. (2d) 508; Siden v. United States (C. C. A.) 9 F.(2d) 241.

The judgments of conviction on the eighth conspiracy count under which Tinsley and Shepherd were sentenced to imprisonment for two years, and Reed for one year, are set aside, and the judgments and sentences as to Tinsley and Shepherd on the other counts of the indictment are affirmed. As to appellant Reed, the judgment on these counts is reversed, and the case remanded for further proceedings as to him in harmony with this opinion.