## GEORGE A. BREON & CO., Inc., v. UNITED STATES.

### No. 10046.

Circuit Court of Appeals, Eighth Circuit.

Nov. 19, 1934.

George D. Beardsley and Harry L. Donnelly, both of Kansas City, Mo. (Beardsley & Beardsley, of Kansas City, Mo., on the brief), for appellant.

J. P. Painter, Asst. to the Sol., U. S. Department of Agriculture, of Washington, D. C. (Maurice M. Milligan, U. S. Atty., of Kansas City, Mo., and Seth Thomas, Sol., U. S. Department of Agriculture, of Washington, D. C., on the brief), for the United States.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

GARDNER, Circuit Judge.

This is an appeal from the judgment of the lower court finding appellant guilty upon the second count of an information charging it with having shipped in interstate commerce a bottle containing one hundred capsules, labeled one-quarter grain dessicated thyroid, and charging that the same was misbranded under the Food and Drug Act (title 21 USCA §§ 1 to 25), in that said capsules contained more than one-quarter grain dessicated thyroid.

We shall refer to the appellant as defendant.

The information contained four counts. Trial by jury was waived, and the court, at

the conclusion of the evidence, found the defendant not guilty on counts 1, 3, and 4, but found it guilty on count 2. Defendant interposed a demurrer to count 2, on the ground that, unless the contents of the capsules fell below the indicated strength and purity, it was not a violation to ship them. The court overruled the demurrer, and also overruled defendant's demurrer to the evidence as to this count.

On this appeal it is contended: (1) That the court erred in overruling the demurrer to count 2 of the information; (2) that the evidence is insufficient to warrant a conviction; and (3) that the verdict is against the declaration of law given by the trial court.

It is earnestly urged by defendant that furnishing an excess of the identical drug stated on the label, the drug being a harmless and wholesome one, is not a crime, and that the Pure Food and Drug Act was intended to protect public health and prevent fraud, and hence does not apply to a case where health is not endangered and no fraud is committed. The government, on the other hand, contends that the act was passed for the purpose of protecting the general public, to preserve their health, and to prevent their being deceived by label or fraud as to the real character of the article offered for sale, and that, where drugs are involved, the act requires a correct statement on the label.

Section 9 of title 21 USCA provides: "The term 'misbranded,' as used in sections 1 to 15, inclusive, of this title, shall apply to all drugs, or articles of food, or articles which enter into the composition of food, the package or label of which shall bear any statement, design, or device regarding such article, or the ingredients or substances contained therein which shall be false or misleading in any particular, and to any food or drug product which is falsely branded as to the State, Territory, or country in which it is manufactured."

Section 10 of title 21 USCA provides in part as follows:

"For the purposes of sections 1 to 15, inclusive, of this title, an article shall be deemed to be misbranded;

"Drugs. In case of drugs:

"*Imitation or Use of Name of Other Article.*—First. If it be an imitation of or offered for sale under the name of another article.

"*Removal and Substitution of Contents of Package, or Failure to State on Label Quantity or Proportion of Narcotics Therein.*— Second. If the contents of the package as originally put up shall have been removed, in whole or in part, and other contents shall have been placed in such package, or if the package fail to bear a statement on the label of the quantity or proportion of any alcohol, morphine, opium. cocaine, heroin, alpha or beta eucaine, chloroform, cannabis indica, chloral hydrate, or acetanilide, or any derivative or preparation of any such substances contained therein.

"*False Statement of Curative or Therapeutic Effect.*—Third. If its package or label shall bear or contain any statement, design, or device regarding the curative or therapeutic effect of such article or any of the ingredients or substances contained therein, which is false and fraudulent."

It appears from the evidence in this case that the drug involved is not a potent, poisonous, or harmful one, and that no harm would result to a person from taking capsules containing approximately one-third of a grain of thyroid, instead of a capsule containing one-quarter of a grain of thyroid, nor, indeed, from the taking of a series of bottles of such capsules. This is not a case in which the defendant is charged with adulteration, but with misbranding, and the falsity of the label is not as to the ingredients or substances contained in the capsules, but as to the quantity contained therein. The government contends that the label is false and misleading within the meaning of section 9, title 21, supra, and that it is not material that the drug was a harmless and wholesome one, nor that the label understated the amount of such drug. It is persuasively argued by defendant that the added strength or quantity of thyroid could not have been within the purpose of this statute, and that the statute was aimed at the giving of a less amount, rather than an excess, and by way of illustration it is said in counsel's brief: "If I sell a package of butter which is labeled 'Pure Creamery Butter, net weight 1 Lb.,' it is necessary to determine the strength, quality and purity of the butter fat and other articles contained in this substance, in order to determine whether or not it is the identical thing stated, namely, pure creamery butter, but if it is pure creamery butter, and I sell in the package 18 ounces of the pure creamery butter instead of the one pound net weight declared on the label, there is no misbranding, because I have sold the identical thing or substance which the label declared. I have merely given the purchaser good measure, and I have violated no law."

In the view we have taken of the other issues involved, however, we do not deem it necessary to pass upon this question.

At the request of defendant, the court gave the following declaration of law: "The court declares the law to be that the burden is upon the Government to show beyond a reasonable doubt that the Thyroid mentioned in Counts One and Two, contained more than ¼ grain of Thyroid, and in such quantity as not to permit a reasonable tolerance or variance, and if the court finds and believes from the evidence that the assay made by the Government chemists under the supervision of the Secretary of Agriculture, was not correct, or if there is a reasonable doubt as to the accuracy of such assay, if any, then the Court should find the defendant not guilty as charged in the First and Second Counts of the information."

The United States Pharmacopœia prescribes a method for determining the iodine content of powdered thyroid. It also states that: "Thyroid contains not less than 0.17 and not more than 0.23 per cent of iodine in thyroid combination, and must be free from iodine in inorganic or any other form of combination than that peculiar to the thyroid gland." The capsules in question contained, in addition to thyroid, calcium, phosphate, carbonate, and starch. One of the government's experts testified that, using the method of analysis prescribed by the United States Pharmacopœia, he obtained a 53 per cent. excess in an analysis of 30 of the one-quarter grain capsules. On analyzing ten more, the result was within 3 per cent. of the first analysis. Another of the government's experts testified that, using twenty of the quarter-grain capsules, he found a 42 per cent. excess.

Counts 3 and 4, which were dismissed, charged violation of the act on the shipment of a bottle of thyroid capsules which were alleged to be adulterated, and the bottle to be misbranded because the label stated the capsules contained one grain of thyroid, while they contained only a small per cent. of a grain. It is interesting to observe that one of the government's chemists testified that the one-grain capsule showed .12 grain of thyroid, while the other government chemist found approximately only .032 grain per capsule. At the trial the government produced six of the one-grain capsules, and offered to have the government's chemist and the defendant's chemist analyze them. The analysis was thereupon made in the United States Pure Food and Drug Laboratory at Kansas City, in strict accordance with the United States

Pharmacopœia method. The result obtained showed 6.82 grains of thyroid per capsule. This was admitted by all the expert witnesses to be an impossible result, as each capsule was only a four-grain capsule to begin with, consisting of one part thyroid powder and three parts filler.

Defendant introduced in evidence the formula used in making the quarter-grain capsules, showing that the proper amount of filler was used to produce one-quarter grain thyroid per capsule. One of the government's chemists testified, on cross-examination, that in the quarter-grain capsule, if the mathematical proportions were proper by weight, and the thyroid substance used was a proper thyroid substance, and the blending was properly done, each capsule should assay the one-quarter grain thyroid, allowing for 100 per cent. efficiency in the mixture. This witness also testified, on cross-examination, that various contents mixed with thyroid powder might cause various results in analysis, depending upon the nature of the material. Another testified, on cross-examination, that there might be a variance in the result of analysis performed by two men working under the same conditions, analyzing the same substance, but that it would be impossible for him to give a general idea as to what the amount of disagreement or discrepancy might be.

As this is a criminal case, it was, of course, incumbent upon the government to prove the charge by evidence that satisfies beyond a reasonable doubt that the defendant was guilty of the charge. Lilienthal's Tobacco v. United States, 97 U. S. 237, 24 L. Ed. 901; Potter v. United States, 155 U. S. 438, 15 S. Ct. 144, 39 L. Ed. 214; Davis v. United States, 160 U. S. 469, 16 S. Ct. 353, 40 L. Ed. 499; Tinsley v. United States (C. C. A. 8) 43 F.(2d) 890; Read v. United States (C. C. A. 8) 42 F.(2d) 636; Salinger v. United States (C. C. A. 8) 23 F.(2d) 48.

The sufficiency of the evidence was challenged by proper motion for judgment of acquittal and demurrer to the evidence interposed at the close of the case. Unless, therefore, there was such substantial evidence in this case, it was the duty of the trial court, a jury being waived, to acquit the accused, and, if all the substantial evidence is as consistent with innocence as with guilt, it is the duty of this court to reverse the judgment against the accused.

It is contended by defendant that there was no evidence that the thyroid in these cap-

sules, in combination with the other elements contained therein, was subject to accurate analysis and assay under the method prescribed in the Pharmacopœia. The Pharmacopœia formula or method appears to contemplate thyroid unmixed with other substances for its analysis. In the one analysis of the one-grain capsule, made during the trial, the government's chemist found 6.82 grains of thyroid per capsule, while in another he found 3.2 per cent. of one grain per capsule. This is a variation of about 22,000 per cent. in net result. The analysis showing 6.82 grains of thyroid is, of course, not only absurd but impossible, and this evidence places the stamp of uncertainty and unreliability for all practical purposes upon the method employed. The variations are so pronounced as to be startling.

The court, in its decision and findings, among other things said, in referring to the third and fourth counts of the information:

"The chemists who have testified, both for the Government and for the defendant, undoubtedly are men of the finest character and ability in their profession, absolutely honest, but the testimony as to the Government, on the one side, is diametrically opposed by the testimony on the other. That is the original testimony offered by the Government and by the defendant was in direct opposition in that regard. If that testimony remained in that situation it would have been impossible to say that the Government had proved its case beyond a reasonable doubt. Upon the suggestion of the Government, however, at the close of the evidence, which suggestion the defendant accepted, an analysis was made by the chemists jointly of a part of the shipment referred to in counts three and four. Well, that analysis showed that each of the capsules contained six grains of thyroid instead of one grain. It was an analysis which didn't help the Government any, and if it is certain that it is an impossible analysis, which is conceded, must be conceded, it brings into some doubt the accuracy of the analysis testified to by the witnesses for the Government. * * *

"The other evidence which was offered by the defendant as to the manner of manufacture of these capsules, the care that is taken in the manufacture of the capsules to see that they went out just as represented and to see to it that there was no violation of any of the requirements of the law or of the regulations, that evidence convinces me that the defendant did not intentionally violate the law; on the contrary did everything that reasonably could be done apparently to comply with the requirements of the law. As the case stands, it seems to me I must find it has been proved beyond a reasonable doubt that the capsules which were in this shipment referred to in the second count of the information did contain a very slight excess of thyroid above the one-fourth grain which it was represented that they contained upon the label attached to and affixed to the bottle. The only argument that is advanced against that conclusion is that this method of analysis, the method of analysis which was used, is inaccurate, does not permit of an accurate result. *Well, I don't know whether it permits of an accurate result or does not permit of an accurate result. * * *

"There is so little in this testimony to justify any punishment at all upon the defendant—nothing except a very technical violation of the law—that even if I were to consider this plea of nolle contendere, I don't think I would add anything to the punishment imposed." (Italics supplied.)

We are of the view that the lower court not only entertained, but expressed, a reasonable doubt of the guilt of the defendant, and we think the familiar rules applicable in criminal cases have not been satisfied in this case. The judgment appealed from is therefore reversed, and the cause remanded, with directions to grant defendant a new trial.